UNITED STATES BANKRUPTCY COURT
DISTRICT OF OREGON

In re                                      )   Case No. _____
                                           )
                                           )   NOTICE OF **PRELIMINARY**
                                           )   HEARING ON MOTION
                                           )      FOR USE OF CASH COLLATERAL
                                           )      TO OBTAIN CREDIT
Debtor(s)                                  )   *(Check One)*

YOU ARE NOTIFIED THAT:

1.    The undersigned moving party, _____, filed a
Motion    For Use of Cash Collateral    To Obtain Credit *(check one)*. A copy of the motion is attached;
and it includes BOTH (i) the statement required by Local Form #541.7, and (ii) the following allegations:

   a.  The immediate and irreparable harm that will come to the estate pending a final hearing is
   _____.

   b.  The amount of    cash collateral    credit *(check one)* necessary to avoid the harm detailed
   above prior to the final hearing is _____.

2.    The name and service address of the moving party's attorney (or moving party, if no attorney) are:
_____.

3.    A **PRELIMINARY** HEARING on the motion WILL BE HELD ON _____ AT _____
IN _____.
Testimony will be received if offered and admissible.

4.    If you WISH TO OBJECT to the motion, YOU MUST DO ONE OR BOTH OF THE FOLLOWING:
(1) ATTEND the preliminary hearing; AND/OR (2) FILE with the Clerk of Court (i.e., if the 5-digit portion
of the Case No. begins with "3" or "4", mail to 1001 SW 5th Ave. #700, Portland OR 97204; OR if it
begins with "6" or "7", mail to 405 E 8th Ave #2600, Eugene OR 97401), BOTH:  (a) a written response,
which states the facts upon which you will rely, AND (b) a certificate showing a COPY of the response
was given DIRECTLY TO the Judge, and served on the U.S. Trustee and the party named in pt. 2 above.
See Local Form #541.51 for details.

5.    On _____ copies of BOTH this notice AND the motion were served pursuant to FRBP 7004 on
the debtor(s); any debtor's attorney; any trustee; any trustee's attorney; members of any committee
elected pursuant to 11 U.S.C. §705; any Creditors' Committee Chairperson [or, if none serving, on all
creditors listed on the list filed pursuant to FRBP 1007(d)]; any Creditors' Committee attorney; the U.S.
Trustee; and all affected lien holders whose names and addresses used for service are as follows:

_____
Signature

_____
(If debtor is movant) Debtor's Address & Taxpayer ID#(s) (last 4 digits)

541.1 (2/13/09)     **\*\*LOCAL FORM #541.51 ATTACHED IF this NOTICE served on PAPER\*\***

721999v1-D-N1

**Brad T. Summers, OSB No. 911116**
tsummers@balljanik.com
**Justin D. Leonard, OSB No. 033736**
jleonard@balljanik.com
BALL JANIK LLP
101 SW Main Street, Suite 1100
Portland, OR 97204
Telephone: (503) 228-2525
Facsimile: (503) 295-1058

Attorneys for States Industries, Inc.

## IN THE UNITED STATES BANKRUPTCY COURT

## FOR THE DISTRICT OF OREGON

| | |
|---|---|
| In re | Case No. 10-65148-fra11 |
| **STATES INDUSTRIES, INC.,** | **DEBTOR'S MOTION FOR INTERIM AND FINAL ORDERS (I) AUTHORIZING DEBTOR TO (A) USE CASH COLLATERAL, (B) OBTAIN POST-PETITION FINANCING AND (C) PROVIDE ADEQUATE PROTECTION, (II) GRANTING LIENS, SECURITY INTERESTS AND SUPERPRIORITY CLAIMS, AND (III) SCHEDULING A FINAL HEARING** |
| Debtor-in-Possession. | |

States Industries, Inc., as debtor and debtor-in-possession ("States" or the "Debtor"),

moves the Court for the entry of interim and final orders: (1) authorizing the Debtor to (a) use

cash collateral, (b) obtain post-petition financing, and (c) provide adequate protection, (2)

granting liens, security interests and superpriority claims, and (3) scheduling a final hearing (the

"Motion"). In support of this Motion, States represents as follows:

::ODMA\PCDOCS\PORTLAND\721992\3-D

# BACKGROUND[1]

## A.    The Chapter 11 Filing

1.    On the date hereof (the "Petition Date"), the Debtor filed a voluntary petition in this Court for relief under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code").

2.    The Debtor continues to manage and operate its business as debtor-in-possession pursuant to sections 1107 and 1108 of the Bankruptcy Code.  No trustee or examiner has been appointed in this chapter 11 case, and no committee has been appointed or designated.

3.    The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334.  Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.  This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2).

4.    The statutory predicates for the relief requested herein are sections 105, 361, 362, 363 and 364 of the Bankruptcy Code and Rules 4001 and 9014 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules").

## B.    The Pre-Petition Credit Agreement

5.    As of the Petition Date, the Debtor and certain non-Debtor affiliates were parties to that certain Loan and Security Agreement dated as of May 3, 1999 (as amended, the "Pre-Petition Credit Agreement," and together with the other documentation executed in connection therewith, the "Pre-Petition Credit Agreements") with LaSalle Business Credit, Inc. ("LaSalle").

6.    Under the Pre-Petition Credit Agreements, LaSalle provided the Debtor with revolving and term loan credit facilities and other financial accommodations.  Under the

---

[1]  The facts in this Motion are supported by the Declaration of John Davidson in Support of Debtor's DIP Financing Motion and Other Motions for First Day Relief filed concurrently herewith.

**Page 2 - DEBTOR'S MOTION FOR INTERIM AND FINAL ORDERS (I) AUTHORIZING DEBTOR TO (A) USE CASH COLLATERAL, (B) OBTAIN POST-PETITION FINANCING AND (C) PROVIDE ADEQUATE PROTECTION, (II) GRANTING LIENS, SECURITY INTERESTS AND SUPERPRIORITY CLAIMS, AND (III) SCHEDULING A FINAL HEARING**

::ODMA\PCDOCS\PORTLAND\721992\3-D

Pre-Petition Credit Agreements, the Debtor and certain of the other non-Debtor subsidiaries granted a security interest to LaSalle in their present and future real or personal property, including equipment, inventory, general intangibles, and accounts receivable (the "Pre-Petition Collateral").

7.      Renwood States Lending, LLC (the "Lender") is the successor-in-interest to the rights of LaSalle under the Pre-Petition Credit Agreements.

8.      The aggregate obligations owing to the Lender as of the Petition Date were approximately $15.5 million in principal amount, plus interest thereon and fees and expenses incurred in connection therewith as provided in the Pre-Petition Credit Agreements (collectively, the "Pre-Petition Debt").

9.      The Debtor believes that the Lender has first priority liens on assets that comprise substantially all of the value of the Debtor's business, subject to permitted liens under the Pre-Petition Credit Agreements.  Substantially all of the Debtor's existing cash and anticipated future cash receipts are generated from the Pre-Petition Collateral and thus constitute cash collateral of the Lender within the meaning of section 363(a) of the Bankruptcy Code (the "Cash Collateral").

10.     The Debtor commenced this chapter 11 case to prevent any interruption to and protect its business while pursuing a sale of its assets.  The Debtor anticipates seeking Court approval for a sale process in the next few weeks.

## RELIEF REQUESTED

11.     By this Motion, the Debtor seeks, among other things, this Court's authorization:

(a)     Under Bankruptcy Code sections 364(c), (d) and (e), for the Debtor to obtain secured post-petition financing (the "Post-Petition Financing"), up to an aggregate

**Page 3 - DEBTOR'S MOTION FOR INTERIM AND FINAL ORDERS (I) AUTHORIZING DEBTOR TO (A) USE CASH COLLATERAL, (B) OBTAIN POST-PETITION FINANCING AND (C) PROVIDE ADEQUATE PROTECTION, (II) GRANTING LIENS, SECURITY INTERESTS AND SUPERPRIORITY CLAIMS, AND (III) SCHEDULING A FINAL HEARING**

::ODMA\PCDOCS\PORTLAND\721992\3-D

BALL JANIK LLP
One Main Place
101 Southwest Main Street, Suite 1100
Portland, Oregon 97204-3219
Telephone 503-228-2525

principal amount of $1,500,000 from the Lender, with all advances by the Lender being subject to the provisions of the Debtor-in-Possession Credit Facility (the "DIP Facility");[2]

   (b) To grant the Lender priority in payment, pursuant to section 364(c)(1) of the Bankruptcy Code with respect to the obligations under the DIP Facility over any and all administrative expenses of the kinds specified, or ordered pursuant to, sections 105, 326, 503(b), 507(a), 507(b) or 726 of the Bankruptcy Code (to the extent permitted by law), subject to the Carve-Out (as defined below);

   (c) To grant the Lender, pursuant to section 364(c) and (d) of the Bankruptcy Code, to secure the Debtor's obligations under the Post-Petition Financing, in each case subject to the Carve-Out:

     (i) Perfected first priority security interests in and liens upon all unencumbered pre-petition and post-petition property of the Debtor, other than causes of action arising under sections 502(d), 544, 545, 547, 548, 549, 550 or 551 of the Bankruptcy Code (collectively, the "Avoidance Actions"); and

     (ii) Perfected junior security interests and liens upon all pre-petition and post-petition property of the Debtor, subject to valid and perfected liens in existence on the Petition Date or to valid liens in existence on the Petition Date that are perfected subsequent to the Petition Date as permitted by section 546(b) of the Bankruptcy Code.  (The security interests and liens to be granted to the Lender as provided herein are collectively referred to as the "Post-Petition Liens.");

   (d) To use "cash collateral" as such term is defined in section 363 of the Bankruptcy Code (the "Cash Collateral") in which the Lender has an interest;

---

[2] A copy of the DIP Facility is attached as **Exhibit A** to the proposed order.  Capitalized terms not defined herein are used as defined in the DIP Facility.

**Page 4 – DEBTOR'S MOTION FOR INTERIM AND FINAL ORDERS (I) AUTHORIZING DEBTOR TO (A) USE CASH COLLATERAL, (B) OBTAIN POST-PETITION FINANCING AND (C) PROVIDE ADEQUATE PROTECTION, (II) GRANTING LIENS, SECURITY INTERESTS AND SUPERPRIORITY CLAIMS, AND (III) SCHEDULING A FINAL HEARING**

::ODMA\PCDOCS\PORTLAND\721992\3-D

BALL JANIK LLP
One Main Place
101 Southwest Main Street, Suite 1100
Portland, Oregon  97204-3219
Telephone 503-228-2525

(e)    To grant the Lender an adequate protection superpriority claim and adequate protection liens, to the extent of and as compensation for any diminution in value of the Lender's interests in the Pre-Petition Collateral; and

(f)    To make monthly adequate protection payments to the Lender in an amount equal to interest on the Pre-Petition Debt, at the non-default rate provided for in the Pre-Petition Credit Agreements, all as set forth in the proposed order attached hereto as **Appendix A.**

## BASIS FOR RELIEF

12.    The key terms of the DIP Facility are summarized below.  Prior to the commencement of this case, the Debtor solicited proposals for debtor-in-possession financing from other third-party financial institutions.  The proposed DIP Facility was the only committed proposal for financing received from any party.

13.    The DIP Facility is the result of arm's-length negotiations between the Lender and the Debtor.  The DIP Facility's significant provisions are:[3]

(a)    <u>Fees</u>:  A commitment fee of $50,000 (DIP Facility, Section 2.2(b));

(b)    <u>Interest Rate</u>:  15% per annum on amounts advanced under the DIP Facility (DIP Facility, Section 1.1, definition of "Applicable Rate");

(c)    <u>Maturity</u>:  October 29, 2010 (DIP Facility, Section 1.1, definition of "Maturity Date");

(d)    <u>Events of Default</u>:  Failure to make payments; failure to maintain insurance or cash management systems; breach of representations; the Debtor's weekly sales are less than those projected in the cash budget by more than 10% per week or more than 15% in the aggregate; cessation of business due to governmental order; dismissal or conversion of chapter 11

---

[3] To the extent the terms set forth herein differ from the terms in the attached order or the DIP Facility, the order and the DIP Facility shall govern.

**Page 5 –** **DEBTOR'S MOTION FOR INTERIM AND FINAL ORDERS (I) AUTHORIZING DEBTOR TO (A) USE CASH COLLATERAL, (B) OBTAIN POST-PETITION FINANCING AND (C) PROVIDE ADEQUATE PROTECTION, (II) GRANTING LIENS, SECURITY INTERESTS AND SUPERPRIORITY CLAIMS, AND (III) SCHEDULING A FINAL HEARING**

::ODMA\PCDOCS\PORTLAND\721992\3-D

BALL JANIK LLP
One Main Place
101 Southwest Main Street, Suite 1100
Portland, Oregon  97204-3219
Telephone 503-228-2525

case; relief from stay granted to another creditor that is material; modification of financing orders; contest of the Lender's claims or liens by the Debtor; no final financing order within 30 days; failure to achieve certain milestones in the sale process (described below); granting superpriority status to another claim or granting a lien equal or superior to the Lender's liens; or the Debtor agrees to sell its assets outside of the ordinary course of business in a sale that is not acceptable to the Lender (DIP Facility, Section 8.1);

(e)     Liens:  All assets other than professional retainers and avoidance actions (DIP Facility, Section 1.1, definitions of "Collateral" and "Excluded Assets");

(f)     Borrowing Limits:  Available credit each week is the lesser of (a) the difference between $1,500,000 and the then existing loan balance, or (b) the amount of the Debtor's cash needs for the week (per the cash budget), less available cash as of the close of the preceding week (DIP Facility, Section 1.1, definition of "Available Credit");

(g)     Borrowing Conditions:  Execution of loan documents; entry of interim order; payment of any fees due to the Lender under the DIP Facility; truth of all representations; receipt of proper request for advance; and no material adverse effects (DIP Facility, Section 5.1);

(h)     Letter of Credit:  The DIP Facility provides that the Lender may make an advance under the DIP Facility to reimburse the issuer of a letter of credit relating to the Debtor's pre-petition self-insured workers' compensation plan, for any full or partial drawing request honored by the issuer.  It further provides that if the letter of credit remains outstanding and partially or wholly undrawn on the maturity date of the DIP Facility, then upon the Lender's request the Debtor shall provide cash collateral to the Lender equal to 105% of the undrawn amount (DIP Facility, Section 2.4); and

(i)     Professional Fee Carve-Out:  Any liens granted pursuant to the DIP Facility or any orders with respect to the DIP Facility and any administrative expense claims (superpriority or otherwise) granted or created in favor of the Lender shall be subordinate and

**Page 6 – DEBTOR'S MOTION FOR INTERIM AND FINAL ORDERS (I) AUTHORIZING DEBTOR TO (A) USE CASH COLLATERAL, (B) OBTAIN POST-PETITION FINANCING AND (C) PROVIDE ADEQUATE PROTECTION, (II) GRANTING LIENS, SECURITY INTERESTS AND SUPERPRIORITY CLAIMS, AND (III) SCHEDULING A FINAL HEARING**

::ODMA\PCDOCS\PORTLAND\721992\3-D

BALL JANIK LLP
One Main Place
101 Southwest Main Street, Suite 1100
Portland, Oregon  97204-3219
Telephone 503-228-2525

subject to the Carve Out.  The "Carve Out" means the quarterly fees payable to the Office of the United States Trustee and fees and expenses payable to professionals retained in the case, including professionals retained by the official committee of unsecured creditors, if any; provided that the amount of the Carve Out for such professional fees and expenses is subject to a cap in the amount of $300,000 (the "Professional Fee Cap").  The cash budget attached to the DIP Facility includes budgeted amounts for payment of such fees and expenses of professionals.  Each week, the Debtor will deposit the budgeted amounts for such payments into a separate bank account, which will not be subject to the Lender's claims, except to the extent there are funds left in the account after payment of the Carve Out.  Any payments made to professionals after the Petition Date will reduce the Professional Fee Cap on a dollar-for-dollar basis, except that any pre-petition retainers shall not count against or reduce the Professional Fee Cap.  The DIP Facility provides that the Carve Out may not be used by the Debtor to contest the Pre-Petition Debt, the Post-Petition Financing or any liens securing the same, but they may be used for those purposes by any committee appointed in the case.  (DIP Facility, Section 3.4.)

14.    In addition, the DIP Facility and/or the proposed order approving the DIP Facility contain the following provisions referred to in Bankruptcy Rule 4001(c)(1)(B)(i)-(xi):

(i)    The proposed order approving the DIP Facility includes a grant of priority over all other administrative expenses, subject to the Carve Out, for amounts owing under the DIP Facility, a grant of first priority liens on all unencumbered property, other than avoidance actions, and a grant of junior priority liens on all property subject to pre-existing liens (Order, Sections 5 and 6);

(ii)    The proposed order approving the DIP Facility provides adequate protection liens and adequate protection superpriority administrative expense claims to the Lender for any diminution in value of the Lender's interests arising from the Debtor's use of the

::ODMA\PCDOCS\PORTLAND\721992\3-D

Pre-Petition Collateral, the granting of liens pursuant to the DIP Facility, or the imposition of the automatic say (Order, Section 8);

(iii)    The proposed order includes stipulations by the Debtor as to the amount of the Lender's claims as of the Petition Date, that the Lender holds liens in all of the Debtor's assets and the assets of its wholly-owned subsidiary, SI Properties, Inc., that the Lender's liens are first in priority, that the Debtor's obligations to the Lender and the Lender's liens are legal, valid, binding and enforceable, and not subject to avoidance or subordination (Order, Section E), and it further provides that any committee appointed in the case shall have 30 days from its formation to challenge the Lender's claims or liens and otherwise the Debtor's stipulations shall be binding on the Debtor, the estate, the Committee and all parties in interest (Order, Section 11);

(iv)    The DIP Facility modifies the automatic stay in the event of a default to permit the Lender to declare a default and declare all amounts outstanding under the DIP Facility to be all due and payable, and to permit the Lender to enforce any remedies for the default on three business days' notice (DIP Facility, Section 8.2(a));

(v)    It is an event of default under the DIP Facility if an order is entered granting any other claim superpriority status or a lien equal or superior to the liens granted to the Lender (DIP Facility, Section 8.1(r)), and the proposed order provides that no such claims or liens may be granted without the Lender's consent (Order, Section 13);

(vi)    The Debtor waives all claims against the Lender and its agents, affiliates, subsidiaries, directors, officers, representatives, attorneys or advisors, directly related to the obligations under the DIP Facility, any financing orders, or the negotiation of the DIP Facility or any financing orders (DIP Facility, Section 9.3(a));

(vii)    The Debtor indemnifies the Lender and its directors, officers, employees, agents, advisors, controlling persons, and affiliates, from and against all expenses, losses, claims, damages and liabilities arising out of claims by any person in any way relating to the transactions

**Page 8 – DEBTOR'S MOTION FOR INTERIM AND FINAL ORDERS (I) AUTHORIZING DEBTOR TO (A) USE CASH COLLATERAL, (B) OBTAIN POST-PETITION FINANCING AND (C) PROVIDE ADEQUATE PROTECTION, (II) GRANTING LIENS, SECURITY INTERESTS AND SUPERPRIORITY CLAIMS, AND (III) SCHEDULING A FINAL HEARING**

::ODMA\PCDOCS\PORTLAND\721992\3-D

BALL JANIK LLP
One Main Place
101 Southwest Main Street, Suite 1100
Portland, Oregon 97204-3219
Telephone 503-228-2525

contemplated by the DIP Facility or the use of the proceeds of extensions of credit thereunder, except to the extent that the same results from the gross negligence or willful misconduct of any indemnified party (DIP Facility, Section 9.3(b)), and the Debtor also indemnifies the Lender from expenses, losses, claims and damages arising out of a letter of credit issued by Bank of America relating to the Debtor's pre-petition self-insured workers' compensation plan (DIP Facility, Section 2.4);

(viii)   The DIP Facility provides that no party indemnified under Section 9.3(b) shall be liable for any special, indirect, consequential or punitive damages in connection with the DIP Facility, or the agreements or transactions contemplated by the DIP Facility (DIP Facility, Section 9.3(b));

(ix)   The DIP Facility provides that it is an event of default under the DIP Facility if the Debtor supports any other person's opposition to any motion made by the Lender seeking confirmation of the amount of the Lender's claim or the validity and enforceability of the Lender's liens, or if the Debtor seeks to, or supports any other person's motion to, disallow or challenge in any fashion the validity and enforceability of the Lender's liens (DIP Facility, Sections 8.1 (k) and (l); and

(x)   The proposed order states that the Debtor has agreed to seek a provision in a final order waiving the Debtor's rights under Section 506(c) of the Bankruptcy Code (Order, Section 17);

(xi)   The proposed order provides that it is sufficient and conclusive evidence of the validity, perfection and priority of the liens granted without the necessity of any other filings or recordings (Order, Section 15); and

(xii)   The DIP Facility provides that it is an event of default if the Debtor fails to meet the following deadlines:  The filing of a sale motion by August 31, 2010; entry of a bidding procedures order and the execution of an asset purchase agreement for the sale of substantially all

**Page 9 - DEBTOR'S MOTION FOR INTERIM AND FINAL ORDERS (I) AUTHORIZING DEBTOR TO (A) USE CASH COLLATERAL, (B) OBTAIN POST-PETITION FINANCING AND (C) PROVIDE ADEQUATE PROTECTION, (II) GRANTING LIENS, SECURITY INTERESTS AND SUPERPRIORITY CLAIMS, AND (III) SCHEDULING A FINAL HEARING**

::ODMA\PCDOCS\PORTLAND\721992\3-D

BALL JANIK LLP
One Main Place
101 Southwest Main Street, Suite 1100
Portland, Oregon  97204-3219
Telephone 503-228-2525

of the debtor's assets by September 15, 2010; entry of a sale order by October 20, 2010; and

closing of a sale by October 27, 2010 (DIP Facility, Section 1.1, definition of "Borrower

Milestones," and Section 8.1(p)), and these are also events of default under the proposed order.

(Order, Section 14)

      15.    Sections 364(c) and (d) of the Bankruptcy Code provide:

> (c)    If the trustee is unable to obtain unsecured credit allowable under section 503(b)(1) of this title as an administrative expense, the court, after notice and a hearing, may authorize the obtaining of credit or the incurring of debt –

>> (1)    with priority over any or all administrative expenses of the kind specified in section 503(b) or, 507(b) of this title;

>> (2)    secured by a lien on property of the estate that is not otherwise subject to a lien; or

>> (3)    secured by a junior lien on property of the estate that is subject to a lien.

> (d)    (1)    The court, after notice and a hearing, may authorize the obtaining of credit or the incurring of debt secured by a senior or equal lien on property of the estate that is subject to a lien only if –

>> (A)    the trustee is unable to obtain such credit otherwise; and

>> (B)    there is adequate protection of the interest of the holder of the lien on the property of the estate on which such senior or equal lien is proposed to be granted.

> (2)    In any hearing under this subsection, the trustee has the burden of proof on the issue of adequate protection.

**Page 10 – DEBTOR'S MOTION FOR INTERIM AND FINAL ORDERS (I) AUTHORIZING DEBTOR TO (A) USE CASH COLLATERAL, (B) OBTAIN POST-PETITION FINANCING AND (C) PROVIDE ADEQUATE PROTECTION, (II) GRANTING LIENS, SECURITY INTERESTS AND SUPERPRIORITY CLAIMS, AND (III) SCHEDULING A FINAL HEARING**

::ODMA\PCDOCS\PORTLAND\721992\3-D

BALL JANIK LLP
One Main Place
101 Southwest Main Street, Suite 1100
Portland, Oregon  97204-3219
Telephone 503-228-2525

The Debtor has been unable to procure required funds in the form of unsecured credit or unsecured debt with an administrative priority.  Moreover, the DIP Facility is the only facility obtained by the Debtor.

16.    Furthermore, the terms of the DIP Facility reflect arm's-length negotiations and the sound exercise of business judgment.  As set forth above, it is critical to maintain the confidence of vendors, employees and customers and, thus, preserve and enhance the Debtor's going concern value.  With the credit provided by the Lender, the Debtor will be able to obtain goods and services in connection with its operations, thereby permitting the Debtor to create revenues to pay its employees and operate its business for the benefit of all parties-in-interest until the time the Debtor consummates a sale of its assets.

17.    In addition, the availability of credit under the DIP Facility should give the Debtor's suppliers and vendors the necessary confidence to continue ongoing relationships with the Debtor, including the extension of credit terms for the payment of goods and services, and be viewed favorably by the Debtor's employees and customers, thereby helping to promote the Debtor's successful restructuring.

18.    Accordingly, this Court should authorize the Debtor to obtain post-petition financing to the extent and pursuant to the DIP Facility and the proposed order attached hereto as **Appendix A** under Bankruptcy Code sections 364(c) and (d).

19.    The terms and conditions of the DIP Facility are fair and reasonable and were negotiated by the parties in good faith and at arm's-length.  Accordingly, the Lender should also be accorded the benefits of Bankruptcy Code section 364(e) in respect of the DIP Facility.

## REQUEST FOR INTERIM RELIEF

20.    Bankruptcy Rules 4001(b) and (c) provide that a final hearing on a motion to obtain credit pursuant to section 364 of the Bankruptcy Code may not be commenced earlier than 14 days after the service of such motion.  Upon request, however, the Court is empowered to

**Page 11 – DEBTOR'S MOTION FOR INTERIM AND FINAL ORDERS (I) AUTHORIZING DEBTOR TO
(A) USE CASH COLLATERAL, (B) OBTAIN POST-PETITION FINANCING AND (C) PROVIDE
ADEQUATE PROTECTION, (II) GRANTING LIENS, SECURITY INTERESTS AND
SUPERPRIORITY CLAIMS, AND (III) SCHEDULING A FINAL HEARING**

::ODMA\PCDOCS\PORTLAND\721992\3-D

BALL JANIK LLP
One Main Place
101 Southwest Main Street, Suite 1100
Portland, Oregon  97204-3219
Telephone 503-228-2525

conduct a preliminary expedited hearing on the motion and authorize the obtaining of credit to the extent necessary to avoid immediate and irreparable harm to the Debtor's estate.

21.    The Debtor requests, pursuant to Bankruptcy Rules 4001(b) and (c), that the Court authorize the Debtor to obtain credit under the DIP Facility in the amount of not more than $1,300,000 from the entry of the interim order until the final hearing.  This will enable the Debtor to maintain ongoing operations and have the means by which it may avoid immediate and irreparable harm and prejudice to its estate and all parties in interest, pending the final hearing.

**LBF 541.7 STATEMENT**

22.    The Interim Order contains the following "disfavored provisions" identified in the LBF 541.7 guidelines for cash collateral and debtor-in-possession financing orders:

(a)    The DIP Facility provides that the Lender may make an advance under the DIP Facility to reimburse the issuer of a letter of credit relating to the Debtor's pre-petition self-insured workers' compensation plan, for any full or partial drawing request honored by the issuer. It further provides that if the letter of credit remains outstanding and partially or wholly undrawn on the maturity date of the DIP Facility, then upon the Lender's request the Debtor shall provide cash collateral to the Lender equal to 105% of the undrawn amount (DIP Facility, Section 2.4);

(b) The proposed order approving the DIP Facility includes findings that the Debtor has stipulated to the amount of the Lender's claims, that the Lender holds a lien on all of the Debtor's assets and the assets of its wholly-owned subsidiary, SI Properties, Inc., that the Lender's liens are first in priority, that the Debtor's obligations to the Lender and the Lender's liens are legal, valid, binding and enforceable, and not subject to avoidance or subordination (Order, Section E), and it further provides that any committee appointed in the case shall have 30 days from its formation to challenge the Lender's claims or liens and otherwise the Debtor's stipulations shall be binding on the Debtor, the estate, the Committee and all parties in interest (Order, Section 11);

::ODMA\PCDOCS\PORTLAND\721992\3-D

BALL JANIK LLP
One Main Place
101 Southwest Main Street, Suite 1100
Portland, Oregon 97204-3219
Telephone 503-228-2525

(c) The proposed order states that the Debtor has agreed to seek a provision in the final order waiving the Debtor's rights under section 506(c) of the Bankruptcy Code (Order, Section 17);

(d) The proposed order provides that it is sufficient and conclusive evidence of the validity, perfection and priority of the liens granted without the necessity of any other filings or recordings (Order, Section 15);

(e)    The DIP Facility includes a waiver of certain claims against the Lender and other Lender-related persons, as described in paragraph 14(vi) above (DIP Facility, Section 9.3(a));

(f)    The DIP Facility provides that it is an event of default if an order is entered granting any other claim a superpriority status or a lien equal or superior to the liens granted to the Lender (DIP Facility, Section 8.1(r)), and the proposed order provides that no such claims or liens may be granted without the Lender's consent (Order, Section 13); and

(g)    The DIP Facility includes a modification of the automatic stay in the event of a default to permit the Lender to declare a default under the DIP Facility and to declare all amounts outstanding under the DIP Facility to be immediately due and payable, and to permit the Lender to enforce any remedies for the default on three business days' notice, and it further provides that conversion to chapter 7 or appointment of a trustee are events of default.  (DIP Facility, Section 8.2(a))

## NOTICE WITH RESPECT TO FINAL HEARING

23.    The Debtor requests that the Court set a final hearing date within 30 days from the entry of the Interim Order and an objection deadline five days prior to the final hearing on the Motion.  The Debtor proposes to serve a copy of the Motion and any interim order which fixes the time and date for filing objections to the Motion, upon (i) any official committee of unsecured creditors appointed in this case (or, if no such committee is appointed, on the creditors included in

::ODMA\PCDOCS\PORTLAND\721992\3-D

BALL JANIK LLP
One Main Place
101 Southwest Main Street, Suite 1100
Portland, Oregon 97204-3219
Telephone 503-228-2525

the list filed under Bankruptcy Rule 1007(d)); (ii) the Office of the United States Trustee; (iii) all

parties who have filed requests for notice under Bankruptcy Rule 2002 as of the date of service;

(iv) the Lender; and (v) all parties who to the knowledge of the Debtor presently hold or claim a

lien upon or security interest in the Debtor's assets.  The Debtor requests that the Court deem

such notice of the final hearing sufficient notice under Bankruptcy Rule 4001.

WHEREFORE, the Debtor respectfully requests that the Court enter the proposed order

attached hereto as **Appendix A**, granting the relief requested herein and such other relief as is just

and proper.

DATED:  August 24, 2010                    BALL JANIK LLP


                                           By:  /s/ Brad T. Summers
                                                **Brad T. Summers, OSB No. 911116**
                                                tsummers@balljanik.com
                                                **Justin D. Leonard, OSB No. 033736**
                                                jleonard@balljanik.com
                                                101 SW Main Street, Suite 1100
                                                Portland, OR  97204

                                           Attorneys for States Industries, Inc.

**Page 14 – DEBTOR'S MOTION FOR INTERIM AND FINAL ORDERS (I) AUTHORIZING DEBTOR TO (A) USE CASH COLLATERAL, (B) OBTAIN POST-PETITION FINANCING AND (C) PROVIDE ADEQUATE PROTECTION, (II) GRANTING LIENS, SECURITY INTERESTS AND SUPERPRIORITY CLAIMS, AND (III) SCHEDULING A FINAL HEARING**

::ODMA\PCDOCS\PORTLAND\721992\3-D

BALL JANIK LLP
One Main Place
101 Southwest Main Street, Suite 1100
Portland, Oregon  97204-3219
Telephone 503-228-2525

**IN THE UNITED STATES BANKRUPTCY COURT**

**FOR THE DISTRICT OF OREGON**

| | |
|---|---|
| In re | Case No. |
| **STATES INDUSTRIES, INC.,** | **INTERIM ORDER PURSUANT TO SECTIONS 361, 362, 363 AND 364 OF THE BANKRUPTCY CODE AND RULE 4001 OF THE BANKRUPTCY RULES (I) AUTHORIZING DEBTOR TO (A) USE CASH COLLATERAL, (B) TO OBTAIN POSTPETITION FINANCING AND (C) PROVIDE ADEQUATE PROTECTION (II) GRANTING LIENS, SECURITY INTERESTS AND SUPERPRIORITY CLAIMS, AND (III) SCHEDULING A FINAL HEARING** |
| Debtor-in-Possession. | |

This matter coming before this Court on the Motion of States Industries, Inc. (the

"Debtor") for Entry and Approval of Interim and Final Orders: (I) Authorizing Debtor to (A) Use

Cash Collateral, (B) to Obtain Postpetition Financing ,and (C) Provide Adequate Protection (II)

Granting Liens, Security Interests and Superpriority Claims, and (III) Scheduling a Final Hearing

PAGE   1-    INTERIM ORDER AUTHORIZING DEBTOR (A) USE CASH
COLLATERAL, (B) TO OBTAIN POSTPETITION FINANCING
AND (C) PROVIDE ADEQUATE PROTECTION

**APPENDIX A
Page 1 of 65**

(the "<u>Motion</u>") for an interim hearing on August __, 2010 (the "<u>Interim Hearing</u>").  The Motion requests the entry of an interim order (the "<u>Interim Order</u>"):

(a)    authorizing and approving, pursuant to sections 105, 361, 362, 363, and 364 of the United States Bankruptcy Code, 11 U.S.C. §§ 101, et seq. (the "<u>Bankruptcy Code</u>") and Rules 2002, 4001 and 9014 of the Federal Rules of Bankruptcy Procedure (the "<u>Bankruptcy Rules</u>"), postpetition financing (the "<u>DIP Facility</u>"), from Renwood States Lending, LLC or its affiliates (together with its successors, assigns and transferees, the "<u>DIP Lender</u>") to (i) fund, among other things, ongoing working capital needs of Debtor, and (ii) pay fees and expenses (including, without limitation, reasonable attorneys' fees and expenses) owed to the DIP Lender under the DIP Facility and the other DIP Facility Documents (as defined below);

(b)    authorizing Debtor to enter into and comply in all respects with the DIP Facility and the other DIP Facility Documents, and approval of all of the terms and conditions of the DIP Facility and the other DIP Facility Documents;

(c)    requesting that the financing under the DIP Facility, including, without limitation, as to all principal, accrued interest, unpaid fees and expenses, indemnification, and all other amounts due from time to time under the documents referred to below, including the Obligations[1] (collectively, the "<u>DIP Facility Obligations</u>"):

(i)    have priority, pursuant to section 364(c)(1) of the Bankruptcy Code, over any and all administrative expenses, subject only to the Carve-Out (as defined below), which allowed superpriority claims of the DIP Lender shall be payable from and have recourse to all prepetition and postpetition property of Debtor, as provided for herein; and

(ii)    pursuant to section 364(c)(2) and 364(d)of the Bankruptcy Code, be and be deemed to be secured by valid, binding, continuing, enforceable, fully perfected and

---

[1]    Capitalized terms not otherwise defined herein shall have the meanings ascribed to them in the DIP Facility Documents.

PAGE  2-    INTERIM ORDER AUTHORIZING DEBTOR (A) USE CASH COLLATERAL, (B) TO OBTAIN POSTPETITION FINANCING AND (C) PROVIDE ADEQUATE PROTECTION

**APPENDIX A
Page 2 of 65**

unavoidable first priority senior security interests in, and liens upon (all such liens and security interests granted to the DIP Lender, pursuant to this Interim Order and the DIP Facility Documents, the "DIP Facility Liens"), all prepetition and postpetition assets of Debtor that are not subject to valid, perfected, enforceable and non-avoidable liens as of the Petition Date, whether now existing or hereafter acquired, including all of the real, personal and mixed property (including equity interests) and all monies and other property of any kind received on account thereof, and all proceeds thereof, in which DIP Facility Liens are granted whether pursuant to the Interim Order and Final Order, as applicable, the DIP Facility Documents, or otherwise, in each case as security for the DIP Facility Obligations (each of the foregoing, the "DIP Collateral"), but specifically being subject solely to the Carve-Out to the extent provided for below; and

(iii)    pursuant to section 364(c)(3) of the Bankruptcy Code, be and be deemed to be secured by valid, binding, continuing, enforceable, fully perfected and unavoidable second priority or other junior DIP Facility Liens upon all DIP Collateral that is subject to valid, perfected, enforceable and non-avoidable liens in existence on the Petition Date or valid liens in existence on the Petition Date that are perfected subsequent to such commencement as permitted by section 546(b) of the Bankruptcy Code, but specifically being subject to the Carve-Out to the extent provided for below;

(d)    the Bankruptcy Court's authorization to use "cash collateral" as such term is defined in section 363 of the Bankruptcy Code (the "Cash Collateral") in which the DIP Lender has an interest;

(e)    the Bankruptcy Court's authorization to grant, as of the Petition Date (defined below), the Adequate Protection Superiority Claim (defined below) and Adequate Protection Liens (defined below), to the extent of and as compensation for any Diminution in Value (defined below), as set forth more fully below and subject to the Carve-Out;

PAGE  3-    INTERIM ORDER AUTHORIZING DEBTOR (A) USE CASH
COLLATERAL, (B) TO OBTAIN POSTPETITION FINANCING
AND (C) PROVIDE ADEQUATE PROTECTION

**APPENDIX A
Page 3 of 65**

(f)     modification by the Bankruptcy Court of the automatic stay imposed by section 362 of the Bankruptcy Code to the extent necessary to implement and effectuate the terms and provisions of the DIP Facility, this Interim Order and the other DIP Facility Documents;

(g)     requesting, pursuant to Bankruptcy Rule 4001, that a final hearing (the "Final Hearing") be held before this Court to consider entry of order authorizing and granting the relief requested in the Motion on a final basis (the "Final Order"); and

(h)     The Bankruptcy Court's waiving of any applicable stay (including under Bankruptcy Rule 6004) and providing for the immediate effectiveness of this Interim Order.

The Bankruptcy Court having found that due and appropriate notice, under the circumstances, of the Motion, the relief requested therein, the material terms of this Interim Order and the Interim Hearing was provided by Debtor pursuant to Bankruptcy Rules 4001(b) and 4001(c)(1), on the following parties:  (a) the Office of the United States Trustee (the "U.S. Trustee"); (b) counsel to the DIP Lender; (c) Debtor's twenty (20) largest unsecured creditors; and (d) all parties known by Debtor to claim any lien on or security interest in any of Debtor's assets (collectively, the "Interim Notice Parties").  The Bankruptcy Court having held the Interim Hearing on August __, 2010; having considered all the pleadings filed with this Court; and having overruled all unresolved objections to the relief requested in the Motion; and upon the record made by Debtor at the Interim Hearing, including the Motion and other filings and pleadings in the Bankruptcy Case, and after due deliberation and consideration and good and sufficient cause appearing therefore;

THE COURT HEREBY MAKES THE FOLLOWING FINDINGS OF FACT AND CONCLUSIONS OF LAW:

A.     Petition Date.  On August __, 2010 (the "Petition Date"), the Debtor filed a voluntary petition under Chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the District of Oregon (the "Bankruptcy Court" or this "Court")).  Debtor continues to

PAGE   4-   INTERIM ORDER AUTHORIZING DEBTOR (A) USE CASH
COLLATERAL, (B) TO OBTAIN POSTPETITION FINANCING
AND (C) PROVIDE ADEQUATE PROTECTION

**APPENDIX A
Page 4 of 65**

operate its business and manage its properties as a debtor in possession pursuant to sections 1107 and 1108 of the Bankruptcy Code.

B.    <u>Jurisdiction and Venue</u>.  This Court has core jurisdiction over Debtor's chapter 11 case (the "<u>Bankruptcy Case</u>"), this Motion and the parties and property affected hereby pursuant to 28 U.S.C. §§ 157(b) and 1334.  Venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

C.    <u>Notice</u>.  Notice of the Interim Hearing, the Motion and proposed entry of this Interim Order has been provided to the Interim Notice Parties.  Under the urgent circumstances, requisite notice of the Motion and the relief requested thereby and this Interim Order has been provided in accordance with Bankruptcy Rules 4001(b) and (c) and 9014, which notice is sufficient for all purposes under the Bankruptcy Code and no further notice of, or hearing on, the Motion or this Interim Order is necessary or required.

D.    <u>Creditors' Committee</u>.  As of the date hereof, the U.S. Trustee has not appointed an official committee of unsecured creditors' ("<u>Committee</u>").

E.    <u>Debtor's Stipulation as to Existing Secured Debt</u>.  Subject to the limitations contained in paragraph 11 of this interim Order, Debtor, for itself, its estate and all representatives of its estate, admits, stipulates, acknowledges and agrees that:

(a)    As of the Petition Date, Debtor owed DIP Lender approximately $15,570,373.04, consisting of principal in the amount of $15,452,281.61, $68,091.43 in accrued interest and fees, and approximately $50,000.00 in attorneys' fees (the "<u>Prepetition Obligation</u>"), pursuant to the Loan Agreement.

(b)    As collateral for the Prepetition Loan, DIP Lender a first-priority security interest in and lien upon (collectively, the "<u>Prepetition Liens</u>") all of the assets of the Debtor and its wholly owned subsidiary, SI Properties, Inc. (the "<u>Prepetition Collateral</u>"), subject only to certain liens with priority over the Prepetition Liens.

PAGE   5-    INTERIM ORDER AUTHORIZING DEBTOR (A) USE CASH
          COLLATERAL, (B) TO OBTAIN POSTPETITION FINANCING
          AND (C) PROVIDE ADEQUATE PROTECTION

**APPENDIX A**
**Page 5 of 65**

(c)       The Prepetition Obligation constitutes the legal, valid and binding obligations of Debtor, enforceable in accordance with its terms (other than in respect of the stay of enforcement arising from section 362 of the Bankruptcy Code).

(d)       No portion of the Prepetition Obligation is subject to avoidance, recharacterization, recovery or subordination pursuant to the Bankruptcy Code or applicable nonbankruptcy law.

(e)       The Prepetition Liens in and to the Prepetition Collateral constitute valid, binding, enforceable, and perfected first-priority (subject only to certain liens with priority over the Prepetition Liens) liens in and to the Prepetition Collateral and are not subject to avoidance, reduction, recharacterization, disallowance, disgorgement, counterclaim, or subordination pursuant to the Bankruptcy Code or applicable non-bankruptcy law.

(f)       Subject to Court approval, Debtor hereby forever releases, any claim, counterclaim, causes of action, defenses or setoff rights, whether arising under the Bankruptcy Code or otherwise against the DIP Lender and its respective affiliates, partners, members, agents, officers, directors, employees, attorneys and advisors whether arising under or in connection with the Prepetition Loan, documents related thereto or the transactions contemplated thereunder, the Prepetition Obligation or the Prepetition Liens, including, without limitation, any right to assert any disgorgement or recovery.

(g)       The foregoing acknowledgments, stipulations and agreements are subject only to the rights of any Committee and parties in interest pursuant to paragraph 11 below.

F.       <u>Findings Regarding Postpetition Financing.</u>

(a)       <u>Debtor's Request</u>.  Debtor has requested from the DIP Lender, and the DIP Lender is willing to extend, certain loans, advances and other financial accommodations,

PAGE 6-    INTERIM ORDER AUTHORIZING DEBTOR (A) USE CASH
COLLATERAL, (B) TO OBTAIN POSTPETITION FINANCING
AND (C) PROVIDE ADEQUATE PROTECTION

**APPENDIX A**
**Page 6 of 65**

as more particularly described and on the terms and conditions set forth in this Interim

Order and the DIP Facility Documents.

(b)      Need for Postpetition Financing.  Good cause has been shown for entry of

this Interim Order.  Debtor has an immediate need to obtain the DIP Facility in order to

permit, among other things, the orderly continuation of the operation of its business, the

management and preservation of Debtor's assets and properties, to maintain business

relationships with lessors, suppliers and customers, to make payroll, to satisfy other

working capital and operational needs and maintain the going concern value of Debtor's

estate.  Without such cash and credit, Debtor's estate would be irreparably harmed.

(c)      No Credit Available on More Favorable Terms.  Debtor represents that it

is unable to obtain sufficient financing from sources other than the DIP Lender on terms

more favorable than under the DIP Credit Agreement (as defined below and in

substantially the form attached as Exhibit A, subject only to non-material modifications

as may be agreed to by the parties thereto) and any and all documents and instruments

delivered pursuant thereto or in connection therewith (inclusive of the DIP Credit

Agreement, the "DIP Facility Documents") and is not able to obtain sufficient unsecured

credit allowable as an administrative expense under section 503(b)(1) of the Bankruptcy

Code.  Debtor is also unable to obtain unsecured credit with the enhanced priority

afforded by section 364(c)(1) of the Bankruptcy Code.  New credit is unavailable to

Debtor without providing the DIP Lender with (a) the DIP Facility Superpriority Claims,

(b) the DIP Facility Liens as provided herein and in the DIP Facility Documents, and (c)

the postpetition rights and remedies provided herein and in the DIP Facility Documents.

(d)      Budget.  Debtor has prepared and delivered the budget (the "Budget") to

the DIP Lender, a copy of which Budget is attached hereto as Exhibit B.  The Budget has

been thoroughly reviewed by Debtor and its management.  Debtor represents that the

Budget is achievable and will allow Debtor to operate its business and otherwise conduct

PAGE  7-    INTERIM ORDER AUTHORIZING DEBTOR (A) USE CASH
COLLATERAL, (B) TO OBTAIN POSTPETITION FINANCING
AND (C) PROVIDE ADEQUATE PROTECTION

**APPENDIX A**
**Page 7 of 65**

its Bankruptcy Case.  The DIP Lender is relying upon Debtor's compliance with the Budget in accordance with the Interim Order in determining to enter into the postpetition financing arrangements provided for herein and in the DIP Facility Documents.

(e)      Business Judgment and Good Faith Pursuant to Section 364(e).  Based on the record of the Interim Hearing, the terms of the DIP Facility Documents and this Interim Order are fair, just and reasonable under the circumstances, ordinary and appropriate for secured financing to Debtor, reflect Debtor's exercise of prudent business judgment consistent with its fiduciary duties and constitute reasonably equivalent value and fair consideration.  The terms of the DIP Credit Agreement and the other DIP Facility Documents have been negotiated in good faith and at arm's length between Debtor and the DIP Lender, with all parties represented by counsel, and any credit extended, loans made, and other financial accommodations extended to Debtor by the DIP Lender shall be deemed to have been extended, issued, or made, as the case may be, in "good faith" as that term is used in section 364(e) of the Bankruptcy Code and in express reliance upon the protections afforded by section 364(e) of the Bankruptcy Code in the event that this Interim Order or any provision hereof is vacated, reversed or modified, on appeal or otherwise.

(f)      Good Cause, Immediate Entry.  Debtor represents that the relief requested by the Motion is necessary, essential and appropriate and is in the best interests of and will benefit Debtor, its estate and its creditors as its implementation will, among other things, provide Debtor with the necessary liquidity to (i) minimize disruption to Debtor's business and on-going operations, (ii) preserve and maximize the value of Debtor's estate for the benefit of all of Debtor's creditors, and (iii) avoid immediate and irreparable harm to Debtor's, its creditors, business, employees, and assets.  Thus, good cause has been shown for the immediate entry of this Interim Order pursuant to Bankruptcy Rules 4001(b)(2) and 4001(c)(2).

PAGE  8-    INTERIM ORDER AUTHORIZING DEBTOR (A) USE CASH
COLLATERAL, (B) TO OBTAIN POSTPETITION FINANCING
AND (C) PROVIDE ADEQUATE PROTECTION

**APPENDIX A**
**Page 8 of 65**

G.    <u>Use of Cash Collateral and Proceeds of the DIP Facility, DIP Collateral and Prepetition Collateral</u>.  All Cash Collateral, all proceeds of the Prepetition Collateral and the DIP Collateral, including proceeds realized from a sale or disposition thereof, or from payment thereon, and all proceeds of the DIP Facility (net of any amounts used to pay fees, costs and expenses payable under this Interim Order or the Final Order) shall be used and/or applied in accordance with the terms and conditions of this Interim Order and the other DIP Facility Documents, for the types of expenditures in the Budget and for no other purpose.

H.    <u>Adequate Protection for Secured Parties</u>.  The DIP Lender has negotiated in good faith regarding the Debtor's use of the Prepetition Collateral (including the Cash Collateral) to fund the administration of the Debtor's estate and continued operation of its businesses, in accordance with the terms hereof.  The DIP Lender has agreed to permit the Debtor to use the Prepetition Collateral, including the Cash Collateral, in accordance with the terms hereof subject to the terms and conditions set forth herein, including the protections afforded parties acting in "good faith" under section 363(m) of the Bankruptcy Code.  The DIP Lender is entitled to the adequate protection as and to the extent set forth herein pursuant to sections 361, 362 and 363 of the Bankruptcy Code.  Based on the Motion and on the record presented to the Bankruptcy Court at the Interim Hearing, the terms of the proposed adequate protection arrangements and of the use of the Cash Collateral are fair and reasonable, reflect the Debtor's prudent exercise of business judgment and constitute reasonably equivalent value and fair consideration for the DIP Lender's consent thereto.

Based upon the foregoing, and after due consideration and good cause appearing therefore; IT IS ORDERED, ADJUDGED AND DECREED, that:

1.    <u>Motion Granted</u>.  The Motion is granted in accordance with Bankruptcy Rule 4001(c)(2) to the extent provided in this Interim Order.  This Interim Order shall immediately become effective upon its entry.

PAGE  9-    INTERIM ORDER AUTHORIZING DEBTOR (A) USE CASH
COLLATERAL, (B) TO OBTAIN POSTPETITION FINANCING
AND (C) PROVIDE ADEQUATE PROTECTION

**APPENDIX A
Page 9 of 65**

2.      Objections Overruled.  All objections to the entry of this Interim Order are
withdrawn or resolved by the terms hereof or, to the extent not resolved, are overruled.

3.      Authorization of the DIP Financing Documents.  Upon execution of that certain
Debtor in Possession Credit Agreement dated August __, 2010 (the "DIP Credit Agreement") by
and between Debtor and the DIP Lender, and provided that Debtor is not in default under the
terms of this Interim Order, Debtor is immediately authorized to borrow under the DIP Facility
from the DIP Lender in an interim amount not to exceed $1,500,000 and to continue to operate
its business, in accordance with the terms of this Interim Order, the DIP Credit Agreement and
the DIP Facility Documents.  Upon execution and delivery of the DIP Facility Documents, the
DIP Facility Documents shall constitute and are hereby deemed to be legal, valid, and binding
obligations of Debtor and Debtor's estate, enforceable against Debtor and its estate in accordance
with the terms of the DIP Facility Documents.

4.      Execution and Compliance with DIP Facility Documents; Conflicts.  The Debtor
is authorized and directed to do and perform all acts, to make, execute and deliver all instruments
and documents (including, without limitation, the DIP Credit Agreement and additional security
agreements, mortgages and financing statements) and to pay, as such become due, fees and
expenses that may be required or necessary for the Debtor's performance hereunder, and under
the DIP Credit Agreement including, without limitation fees and other expenses described in this
Interim Order, in the DIP Credit Agreement (other than fees and expenses of the Debtor's
professionals, which fees and expenses may only be paid upon entry of an order of this Court).
Except as modified by this Interim Order, the Loan Agreement shall remain in full force and
effect with respect to the Prepetition Obligation.  To the extent there exists any conflict between
the Motion, this Interim Order, and the terms of either the Loan Agreement or the DIP Credit
Agreement, this Interim Order shall govern and control.

5.      DIP Facility Superpriority Claims.  As security for the DIP Facility Obligations
now existing or hereafter arising pursuant to the DIP Facility, the DIP Facility Documents and

PAGE  10-  INTERIM ORDER AUTHORIZING DEBTOR (A) USE CASH
COLLATERAL, (B) TO OBTAIN POSTPETITION FINANCING
AND (C) PROVIDE ADEQUATE PROTECTION

APPENDIX A
Page 10 of 65

this Interim Order, to the extent the DIP Facility Liens do not satisfy the DIP Facility

Obligations, the DIP Lender is granted an allowed super-priority administrative claim pursuant

to section 364(c)(1) of the Bankruptcy Code, which claim shall have priority in right of payment

over any and all other obligations, liabilities and indebtedness of Debtor, now in existence or

hereafter incurred by Debtor and over any and all administrative expenses or priority claims of

the kind specified in, or ordered pursuant to, inter alia, sections 105, 326, 328, 330, 331, 503(b),

507(a), 507(b), and/or 364(c)(1) of the Bankruptcy Code (the "DIP Facility Superpriority

Claim"), whether or not such expenses or claims may become secured by a judgment lien or

other non-consensual lien, levy or attachment, which allowed claim shall be payable from and

have recourse to all pre and postpetition property of Debtor and all proceeds thereof, provided,

however, that the DIP Facility Superpriority Claim shall be subordinate to the Carve-Out to the

extent specifically provided for in paragraph 9 of this Interim Order.

6.      DIP Facility Liens.  As security for the DIP Facility Obligations, pursuant to

sections 364(c)(2), (c)(3) and (d) of the Bankruptcy Code, the DIP Lender shall have, and is

hereby granted (effective and perfected upon the date of this Interim Order and without the

necessity of the execution by Debtor or the filing or recordation of mortgages, security

agreements, control agreements, pledge agreements, lock box agreements financing statements,

or otherwise) the DIP Facility Liens; provided, however that such liens and security interests

shall not include Avoidance Actions or the proceeds thereof:

(a)      pursuant to section 364(c)(2) of the Bankruptcy Code, valid, perfected,

enforceable and non-avoidable first priority liens on and security interests in all now owned or

hereafter acquired assets and property of Debtor, that are not subject to valid, perfected,

enforceable and non-avoidable liens as of the Petition Date;

(b)      pursuant to section 364(c)(3) of the Bankruptcy Code, valid, perfected,

enforceable and non-avoidable second priority or other junior liens on and security interests in all

now owned or hereafter acquired assets and property of Debtor that are subject to valid,

PAGE  11-   INTERIM ORDER AUTHORIZING DEBTOR (A) USE CASH
COLLATERAL, (B) TO OBTAIN POSTPETITION FINANCING
AND (C) PROVIDE ADEQUATE PROTECTION

**APPENDIX A
Page 11 of 65**

perfected, enforceable and non-avoidable liens in existence on the Petition Date or to valid liens in existence on the Petition Date that are perfected subsequent to such commencement as permitted by section 546(b) of the Bankruptcy Code; and

(c)     In the event of the occurrence of an Event of Default (as defined below), or an event that would constitute an Event of Default with the giving of notice or lapse of time, the DIP Facility Liens shall be subject only to the payment of the Carve-Out (as defined below).

7.     <u>Authorization and Approval to Use Cash Collateral and Proceeds of DIP Facility</u>. Subject to the terms and conditions of this Interim Order and the other DIP Facility Documents, and to the adequate protection granted to or for the benefit of the DIP Lender as hereinafter set forth, the Debtor is authorized to (a) use the Cash Collateral and (b) request and use proceeds of the DIP Facility Loan, in each case for the types of expenditures set forth in the Budget.  The Budget may only be amended, supplemented, modified, restated, replaced, or extended in accordance with the DIP Facility Documents and the prior written consent of the DIP Lender.

8.     <u>Adequate Protection for Prepetition Secured Parties</u>.  As adequate protection for the interests of the DIP Lender in the Prepetition Collateral (including Cash Collateral), the DIP Lender shall receive adequate protection as follows:

(a)     <u>Adequate Protection Liens</u>.  To the extent of, and in an aggregate amount equal to, the diminution in value of such interests, from and after the Petition Date, calculated in accordance with section 506(a) of the Bankruptcy Code, resulting from, among other things, the use, sale or lease by the Debtor of the Prepetition Collateral (including the use of Cash Collateral), the granting of the DIP Facility Liens, the subordination of the Prepetition Liens thereto and to the Carve-Out, or the imposition or enforcement of the automatic stay of section 362(a) of the Bankruptcy Code (collectively, "<u>Diminution in Value</u>"), the DIP Lender shall have pursuant to sections 361, 363(e) and 364(d) of the Bankruptcy Code, replacement security interests in and liens upon (the "<u>Adequate Protection Liens</u>") all of the DIP Collateral, which shall be (i) junior and subject to the DIP Facility Liens and (ii) junior and subject to all other

PAGE  12-  INTERIM ORDER AUTHORIZING DEBTOR (A) USE CASH
COLLATERAL, (B) TO OBTAIN POSTPETITION FINANCING
AND (C) PROVIDE ADEQUATE PROTECTION

**APPENDIX A
Page 12 of 65**

liens thereon.  The Adequate Protection Liens shall in all cases be subject to the Carve-Out.

(b)     Adequate Protection Superpriority Claims.  To the extent of the aggregate Diminution in Value, the DIP Lender shall have, subject to the payment of the Carve-Out, an allowed superpriority administrative expense claim (the "Adequate Protection Superpriority Claim") as provided for in section 507(b) of the Bankruptcy Code, immediately junior and subject to the DIP Facility Superpriority Claim, and payable from and having recourse to all DIP Collateral; provided, that the DIP Lender shall not receive or retain any payments, property, distribution or other amounts in respect of the Adequate Protection Superpriority Claim unless and until the DIP Facility Obligations and (without duplication) the DIP Facility Superpriority Claim have indefeasibly been paid in full in cash.

(c)     Adequate Protection Payments, etc.  The DIP Lender shall receive from the Debtor when due, on a monthly basis, adequate protection payments in an amount equal to interest on the Prepetition Obligations, at the non-default rate provided for in the Prepetition Loan Documents.

9.     Carve-Out.  The liens, security interests and super-priority administrative expense claims of the DIP Lender shall be subject to and subordinate only to (a) amounts payable pursuant to 28 U.S.C. § 1930(a)(6) and any fees payable to the clerk of the Bankruptcy Court (collectively, the "UST/Clerk Fees"); and (b) allowed, unpaid postpetition fees and expenses of attorneys, accountants, and other professionals retained in the Bankruptcy Case by Debtor or the Committee (collectively, the "Professionals") pursuant to sections 327, 328 and 1103 of the Bankruptcy Code (the "Priority Professional Expenses"), but the amount entitled to priority under this sub-clause (b) shall not exceed $300,000 without the prior written consent of the DIP Lender (the "Professional Expense Cap," and together with the UST/Clerk Fees, the "Carve-Out"); provided, however, that any payments actually made to the Professionals after the date hereof, whether under sections 330 and 331 of the Bankruptcy Code or otherwise, shall reduce the Professional Expense Cap on a dollar-for-dollar basis, irrespective of whether such payment

PAGE  13-   INTERIM ORDER AUTHORIZING DEBTOR (A) USE CASH
COLLATERAL, (B) TO OBTAIN POSTPETITION FINANCING
AND (C) PROVIDE ADEQUATE PROTECTION

**APPENDIX A
Page 13 of 65**

was made pre-Event of Default or post-Event of Default, it being expressly understood that any prepetition retainers held by Professionals shall not count against, and shall not reduce, the Professional Expense Cap.  The Carve-Out shall be free and clear of all liens, claims and encumbrances granted hereunder and shall be subject only to the allowed claims of the Professionals for such fees and expenses as may be awarded by the Bankruptcy Court under sections 327 or 328 of the Bankruptcy Code; provided, however, the Carve-Out cannot be used for the payment or reimbursement of any fees or disbursements of Debtor incurred in connection with the assertion or joinder in any claim, counter-claim, action, proceeding, application, motion, objection, defense or other contested matter, the purpose of which is to seek any order, judgment, determination or similar relief invalidating, setting aside, avoiding, subordinating, in whole or in part, the DIP Facility Obligations or the Prepetition Obligation or lien and security interest securing the DIP Facility Obligations or the Prepetition Obligation; provided that the Carve-Out may be used by the Committee to investigate the Prepetition Obligation and the validity and perfection of the liens and security interests securing the Prepetition Obligation.

10.    Fees and Expenses of Professionals.  So long as no Event of Default shall have occurred and be continuing or have occurred and be waived, Debtor shall be permitted to pay the compensation and reimbursement of fees and expenses allowed and payable under sections 328, 330 and 331 of the Bankruptcy Code (but excluding fees and expenses of third party professionals employed by Committee members), as the same may be due and payable and as are otherwise permitted under this Interim Order and the DIP Credit Agreement; including without limitation any payments reserved or made pursuant to the terms of the DIP Credit Agreement or any order authorizing the reservation or payment of professional fees and expenses.  Nothing contained herein is intended to constitute, nor should be construed as consent to the allowance of any fees, disbursements or expenses by any party and nothing herein shall affect the ability or right of Debtor, the DIP Lender, the Committee, the U.S. Trustee or any other party in interest to object to the allowance and payment of any amounts incurred or requested.

PAGE  14-  INTERIM ORDER AUTHORIZING DEBTOR (A) USE CASH
         COLLATERAL, (B) TO OBTAIN POSTPETITION FINANCING
         AND (C) PROVIDE ADEQUATE PROTECTION

**APPENDIX A
Page 14 of 65**

11. <u>Prepetition Lien/Claim Challenge</u>. The stipulations and admissions contained in the Interim Order shall be binding upon Debtor and its estate in all circumstances. Subject to the terms of this paragraph, the Committee shall have thirty (30) days from the formation of the Committee (and if no Committee is formed, any party-in-interest shall have thirty (30) days from entry of this Interim Order) within which to commence an adversary proceeding (collectively, a "<u>Prepetition Lien/Claim Challenge</u>") with respect to the validity, priority, extent, perfection, and enforceability of the Prepetition Liens or the Prepetition Obligation, or any other claims or causes of action against the DIP Lender relating to the Prepetition Loan. If such a Prepetition Lien/Claim Challenge is not timely commenced within such applicable period set forth above, (a) the stipulations contained in paragraph E of this Interim Order shall be irrevocably binding on the estate, the Committee and all parties in interest, (b) the Prepetition Liens or the Prepetition Obligation and the DIP Facility Liens upon and security interests in the DIP Collateral shall be recognized and allowed as valid, binding, in full force and effect, not subject to any claims, counterclaims, setoff or defenses and perfected, (c) the Committee and any other party in interest shall thereafter be forever barred from bringing any Prepetition Lien/Claim Challenge, and (d) the DIP Lender and its respective agents, officers, directors and employees shall be deemed released and discharged from all claims and causes of action of any kind, nature or description arising at any time immediately prior to the Petition Date, and all of Debtor's acknowledgements, releases and waivers of claims granted to or in favor of the DIP Lender relating to the Prepetition Loan in accordance with this Interim Order shall be binding upon all parties-in-interest in the Bankruptcy Case. Nothing in this Interim Order shall be deemed to confer or deny standing to the Committee to commence an action.

12. <u>Restrictions on Use of Proceeds</u>. Subject to the limitations applicable in the DIP Credit Agreement, until entry of the Final Order, Debtor shall use the proceeds of the DIP Facility made or arranged for by the DIP Lender pursuant to the DIP Facility Documents and this Interim Order, and in accordance with this Interim Order and the Budget: (a) to support the

PAGE 15- INTERIM ORDER AUTHORIZING DEBTOR (A) USE CASH
COLLATERAL, (B) TO OBTAIN POSTPETITION FINANCING
AND (C) PROVIDE ADEQUATE PROTECTION

**APPENDIX A
Page 15 of 65**

working capital and general corporate purposes of Debtor, (b) to make any other payments permitted to be made by the Bankruptcy Code, in this Interim Order or in any other order of this Court to the extent provided for under the DIP Facility Documents or consented to by the DIP Lender as provided in the DIP Facility Documents, and (c) to pay certain fees and expenses relating to the credit facilities established under the DIP Facility Documents.

13.     Restrictions on Debtor.  Other than the Carve-Out, no claim having a priority superior or pari passu with those granted by this Interim Order to the DIP Lender shall be granted or permitted by any order of the Bankruptcy Court heretofore or hereafter entered in the Bankruptcy Case, while any portion of the DIP Facility (or refinancing thereof) or the commitment thereunder remains outstanding without the express written consent of the DIP Lender.  Except as may be expressly permitted by the DIP Credit Agreement, Debtor will not, at any time during the Bankruptcy Case, grant mortgages, security interests, or liens in the DIP Collateral or any portion thereof to any other parties pursuant to section 364(d) of the Bankruptcy Code or otherwise without the express written consent of the DIP Lender.

14.     Events of Default.  Notwithstanding this Interim Order, it shall be deemed an Event of Default by Debtor under the DIP Facility if Debtor, among other things: (i) attempts to prime the DIP Lender, (ii) a trustee, receiver or examiner is appointed, and (iii) the conversion of the Bankruptcy Case to a case under chapter 7 of the Bankruptcy Code, (iv) the dismissal of the Bankruptcy Case by the Bankruptcy Court, (v) the Debtor has failed to meet any of the Borrower Milestones set forth in the DIP Credit Agreement, or (vi) there is an event of default under the DIP Credit Agreement.

15.     Lien Perfection.  This Interim Order shall be sufficient and conclusive evidence of the validity, perfection and priority of the DIP Facility Liens and the Adequate Protection Liens without the necessity of filing or recording any financing statement, deed of trust, mortgage, or other instrument or document which may otherwise be required under the law of any jurisdiction or the taking of any other action to validate or perfect the DIP Facility Liens and the Adequate

PAGE   16-   INTERIM ORDER AUTHORIZING DEBTOR (A) USE CASH
COLLATERAL, (B) TO OBTAIN POSTPETITION FINANCING
AND (C) PROVIDE ADEQUATE PROTECTION

**APPENDIX A
Page 16 of 65**

Protection Liens or to entitle the DIP Facility Liens and the Adequate Protection Liens to the priorities granted herein.  Notwithstanding the foregoing, the DIP Lender may, in its sole discretion, file such financing statements, mortgages, security agreements, notices of liens and other similar documents, and are hereby granted relief from the automatic stay of section 362 of the Bankruptcy Code in order to do so, and all such financing statements, mortgages, security agreements, notices and other agreements or documents shall be deemed to have been filed or recorded as of the Petition Date.  The Debtor shall execute and deliver to the DIP Lender all such financing statements, mortgages, security agreements, notices and other documents as the DIP Lender may reasonably request to evidence, confirm, validate or perfect, or to insure the contemplated priority of, the DIP Facility Liens and the Adequate Protection Liens.

16.     Modification of Automatic Stay.  Subject only to the provisions of the DIP Credit Agreement and without further order from this Court, the automatic stay provisions of section 362 of the Bankruptcy Code are vacated and modified to the extent necessary to permit the DIP Lender to implement the provisions of the DIP Facility Documents and this Interim Order except for exercising, upon the occurrence and during the continuance of any Event of Default, all rights and remedies provided for in the DIP Facility Documents; provided, however, that prior to the exercise of any enforcement or liquidation remedies against the DIP Collateral, the DIP Lender shall file a motion for relief from stay, which the DIP Lender shall be entitled to have heard, subject to the Bankruptcy Court's availability, after five (5) business days written notice to Debtor, counsel for Debtor, counsel to the Committee, if any, the Interim Notice Parties and all parties who have filed requests for notices under Bankruptcy Rule 9010(b).  Such hearing may be held telephonically.

17.     Waiver of Claims under Section 506(c).  The Debtor's rights under section 506(c) of the Bankruptcy Code are preserved until entry of a Final Order; the Debtor has agreed to seek a provision in the Final Order, in a form acceptable to the DIP Lender that would waive the Debtor's rights under section 506(c) of the Bankruptcy Code.  Nothing contained in this Interim

PAGE  17-  INTERIM ORDER AUTHORIZING DEBTOR (A) USE CASH
COLLATERAL, (B) TO OBTAIN POSTPETITION FINANCING
AND (C) PROVIDE ADEQUATE PROTECTION

APPENDIX A
Page 17 of 65

Order, in the Final Order or in the other DIP Facility Documents shall be deemed a consent by the DIP Lender to any charge, lien, assessment or claim against, or in respect of, the DIP Collateral or the Prepetition Collateral under section 506(c) of the Bankruptcy Code or otherwise.

18.    <u>Binding Effect of Interim Order and DIP Facility Documents</u>.  The provisions of this Interim Order and the DIP Facility Documents shall be binding upon and inure to the benefit all parties-in-interest in the Bankruptcy Case, including, without limitation, Debtor, the DIP Lender, and the Committee, and their respective successors and assigns; <u>provided</u>, <u>however</u>, that DIP Lender shall have no obligation to extend any financing to any Chapter 7 trustee or similar responsible person appointed for Debtor's estate.

19.    <u>Survival</u>.  The rights of the DIP Lender under the DIP Facility Documents or this Interim Order, the provisions of this Interim Order and any actions taken pursuant hereto shall survive the entry of any order (i) confirming a plan in the Bankruptcy Case (and, to the extent not satisfied in full in cash, the DIP Facility Obligations shall not be discharged by the entry of any such order, or pursuant to section 1141(d)(4) of the Bankruptcy Code); (ii) converting the Bankruptcy Case to a chapter 7 case; or (iii) dismissing the Bankruptcy Case, and the terms and provisions of this Interim Order as well as the DIP Facility Superpriority Claims and the DIP Facility Liens granted to and conferred upon the DIP Lender and the protection afforded to the DIP Lender pursuant to this Interim Order and the DIP Facility Documents shall continue in full force and effect notwithstanding the entry of any such order, and such claims and liens shall maintain their priority as provided by this Interim Order and the DIP Facility Documents and to the maximum extent permitted by law until all of the DIP Facility Obligations shall have been paid and satisfied in full in accordance with the provisions of the DIP Credit Agreement (and that such DIP Facility Liens, DIP Facility Superpriority Claims and other protections shall remain binding on all interested parties).

PAGE  18-  INTERIM ORDER AUTHORIZING DEBTOR (A) USE CASH
COLLATERAL, (B) TO OBTAIN POSTPETITION FINANCING
AND (C) PROVIDE ADEQUATE PROTECTION

**APPENDIX A
Page 18 of 65**

20.   <u>Access to Debtor</u>.  Without limiting the rights of access and information afforded the DIP Lender under the DIP Facility Documents, Debtor shall permit representatives, agents and/or employees of the DIP Lender to have reasonable access to its premises and records during normal business hours (without unreasonable interference with the proper operation of Debtor's business) and shall cooperate, consult with, and provide to such representatives, agents and/or employees all such non-privileged information as they may reasonably request.

21.   <u>Amendment to DIP Facility Documents</u>.  The DIP Lender, with the consent of Debtor, is authorized to amend and/or modify the DIP Credit Agreement or any other DIP Facility Documents without the necessity of a hearing; <u>provided</u> that any such amendments or modifications must be in writing and served upon counsel for the Committee (if appointed at such time), the U.S. Trustee and all parties who filed requests for notices under Bankruptcy Rule 9010(b) or were entitled to notice under Bankruptcy Rule 2002; <u>provided</u>, <u>further</u> that if Debtor have not received any written objections to such amendments or modifications within five (5) Business Days after such service, Debtor shall be entitled to submit an order to the Bankruptcy Court, together with a copy of the proposed amendments or modifications and a certification that no objections have been received with the appropriate notice period.  If the Bankruptcy Court is satisfied that no objections have been received it may enter the order as proposed.

22.   <u>Remedies upon Occurrence of Event of Default</u>.

(a)   The Debtor's authority to borrow pursuant to the terms of the Interim Order shall terminate, without notice to the Debtor or further leave of Bankruptcy Court (i) automatically on September 24, 2010, unless a Final Order acceptable to the DIP Lender in its reasonable discretion is entered on or prior to such date, or (ii) after an Event of Default (in either case, the "<u>Termination Date</u>"), unless, following the occurrence of an Event of Default, such authority is extended by the written agreement of the Debtor and the DIP Lender, <u>provided</u>, <u>however</u>, nothing herein shall obligate the DIP Lender to make any advances after the

PAGE 19-  INTERIM ORDER AUTHORIZING DEBTOR (A) USE CASH
COLLATERAL, (B) TO OBTAIN POSTPETITION FINANCING
AND (C) PROVIDE ADEQUATE PROTECTION

**APPENDIX A**
**Page 19 of 65**

Termination Date.  All outstanding amounts of the DIP Facility shall be due and payable on the Termination Date.

(b)    Notwithstanding the occurrence of the Termination Date or anything herein to the contrary, all of the liens, rights, remedies, benefits and protections provided to the DIP Lender under this Interim Order and under the DIP Credit Agreement, including, without limitation, the DIP Facility Liens, Adequate Protection Liens, DIP Facility Superpriority Claim and Adequate Protection Superpriority Claim granted herein, shall survive the Termination Date.

23.    Reservation of Rights.  Entry of this Interim Order shall not be deemed to prejudice any and all rights, remedies, claims and causes of action the DIP Lender may have against third parties, and shall not prejudice the rights of the DIP Lender from and after the entry of this Interim Order to seek any other relief in the Bankruptcy Case.  Entry of this Interim Order shall not in any way constitute:  (a) a preclusion or a waiver of any right of the DIP Lender to file, or to prosecute if already filed, a motion for relief from stay, a motion or request for other relief, including but not limited to any adversary proceeding; (b) agreement, consent, or acquiescence to the terms of any plan by virtue of any term or provision of this Interim Order; (c) a preclusion or waiver to assert any other rights, remedies or defenses available to the DIP Lender, or to respond to any motion, application, proposal, or other action, all such rights, remedies, defenses and opportunities to respond being specifically reserved by the DIP Lender; or (d) a preclusion, waiver or modification of any rights or remedies that the DIP Lender have against any other person or entity.

24.    Restrictions on Additional Financing.  Until entry of the Final Order, all postpetition advances and other financial accommodations under the DIP Credit Agreement and the other DIP Facility Documents are made in reliance on this Interim Order and in the event that an order is entered at any time in the Bankruptcy Case or in any subsequently converted case under Chapter 7 of the Bankruptcy Code (other than the Final Order) which (a) authorizes the use of Cash Collateral or the sale, lease, or other disposition of property of Debtor's estate in

PAGE   20-   INTERIM ORDER AUTHORIZING DEBTOR (A) USE CASH
COLLATERAL, (B) TO OBTAIN POSTPETITION FINANCING
AND (C) PROVIDE ADEQUATE PROTECTION

**APPENDIX A
Page 20 of 65**

which the DIP Lender has a lien or security interest, except as expressly permitted hereunder or in the DIP Facility Documents, or (b) authorizes under section 364 of the Bankruptcy Code the obtaining of credit or the incurring of indebtedness secured by a lien or security interest which is equal or senior to a lien or security interest in property in which the DIP Lender holds a lien or security interest, or which is entitled to priority administrative claim status which is equal or superior to that granted to the DIP Lender herein; then, in each instance described in clauses (a) and (b) of this paragraph, (i) the DIP Lender as is required by the DIP Credit Agreement shall first have given its express prior written consent thereto, no such consent being implied from any other action, inaction or acquiescence by the  DIP Lender, or (ii) such other order shall require that all DIP Facility Obligations first shall be indefeasibly paid in full in immediately available funds.  The liens and security interests granted to or for the benefit of the DIP Lender hereunder and the rights of the DIP Lender pursuant to this Interim Order and the DIP Facility Documents with respect to the DIP Facility Obligations and the DIP Collateral are cumulative and shall not be altered, modified, extended, impaired, or affected by any plan of reorganization of Debtor and, if the DIP Lender shall expressly consent in writing that the DIP Facility Obligations shall not be repaid in full upon confirmation and effectiveness thereof, shall continue after confirmation and effectiveness of any such plan.

25.    No Modification or Stay of Interim Order.  If any or all of the provisions of this Interim Order or the DIP Facility Agreement are hereafter modified, vacated or stayed, such modification, vacation or stay shall not affect (a) the validity of any obligation, indebtedness or liability incurred by Debtor to the DIP Lender prior to the effective date of such modification, vacation or stay, or (b) the validity or enforceability of any security interest, lien, or priority authorized or created hereunder or pursuant to the DIP Facility Documents, as applicable. Notwithstanding any such modification, vacation or stay, any indebtedness, obligations or liabilities incurred by Debtor to the DIP Lender prior to the effective date of such modification, vacation or stay shall be governed in all respects by the original provisions of this Interim Order;

PAGE  21-  INTERIM ORDER AUTHORIZING DEBTOR (A) USE CASH
COLLATERAL, (B) TO OBTAIN POSTPETITION FINANCING
AND (C) PROVIDE ADEQUATE PROTECTION

**APPENDIX A
Page 21 of 65**

and the DIP Lender shall be entitled to all the rights, remedies, privileges and benefits granted herein with respect to all such indebtedness, obligations and/or liabilities.

26.    <u>Final Hearing and Objection Date</u>.  This matter is set for a Final Hearing at ___ __.m. on _____, September __, 2010, in the United States Bankruptcy Court for the District of Oregon.  Debtor shall promptly mail copies of this Interim Order to (a) the Interim Notice Parties, (ii) all parties who filed requests for notices under Bankruptcy Rule 9010(b) or were entitled to notice under Bankruptcy Rule 2002, (iii) counsel to be selected by the Committee upon its formation if selected by such date, (iv)  the taxing authorities to which Debtor pay taxes; and (v) those other creditors known to Debtor who may have liens upon or perfected security interests in any of Debtor's assets and properties.  Objections to the entry of the Final Order shall be in writing and shall be filed with the Clerk of this Court, on or before September __, 2008, at 4:30 p.m., with a copy served upon: (i) counsel for Debtor, Ball Janik LLP, One Main Place, 101 SW Main St, Suite 1100, Portland, OR  97204, Attn: Brad T. Summers; (ii) counsel for DIP Lender, Perkins Coie LLP, 1120 NW Couch Street, 10th Floor, Portland, OR 97209, Attn: Jeanette L. Thomas; (iii) counsel to be selected by the Committee upon its formation if selected by such date; and (iv) the U.S. Trustee.

27.    <u>Conflicting Provisions</u>.  Unless otherwise provided in this Interim Order, to the extent the terms and conditions of the DIP Facility Documents are in conflict with the terms and conditions of this Interim Order, the terms and conditions of this Interim Order shall control.

PAGE   22-   INTERIM ORDER AUTHORIZING DEBTOR (A) USE CASH
                     COLLATERAL, (B) TO OBTAIN POSTPETITION FINANCING
                     AND (C) PROVIDE ADEQUATE PROTECTION

**APPENDIX A
Page 22 of 65**

28.    <u>Effectiveness</u>.  Notwithstanding any Bankruptcy Rule to the contrary, the terms

and conditions of this Interim Order shall (a) be immediately enforceable, and (b) not be stayed

absent the grant of such stay under Bankruptcy Rule 8005 after a hearing upon notice to Debtor

and the DIP Lender.

# # #


Presented by:

BALL JANIK LLP

By:    <u>/s/ Brad T. Summers</u>
        Brad T. Summers, OSB No. 911116
        Attorneys for Debtor States Industries, Inc.

cc:    See attached list of interested parties


PAGE   23-   INTERIM ORDER AUTHORIZING DEBTOR (A) USE CASH
                COLLATERAL, (B) TO OBTAIN POSTPETITION FINANCING
                AND (C) PROVIDE ADEQUATE PROTECTION

**APPENDIX A**
**Page 23 of 65**

**EXHIBIT A**

**DIP CREDIT AGREEMENT**

# DEBTOR IN POSSESSION CREDIT AGREEMENT

between

**STATES INDUSTRIES, INC.,**
**debtor and debtor in possession,**
**Borrower**

and

**RENWOOD STATES LENDING, LLC,**
**Lender**

**AUGUST __, 2010**

74117-0001/LEGAL18945665.3

# CONTENTS

ARTICLE I.   DEFINITIONS .................................................................................. 1

   1.1   DEFINED TERMS ......................................................................... 1

   1.2   HEADINGS ................................................................................... 7

   1.3   GENERAL DEFINITIONAL PROVISIONS ................................. 7

ARTICLE II.   THE CREDITS ............................................................................... 8

   2.1   THE LOAN .................................................................................... 8

   2.2   INTEREST; FEES; PAYMENTS .................................................. 8

   2.3   AUTHORIZED REPRESENTATIVES .......................................... 9

   2.4   LETTER OF CREDIT .................................................................... 9

ARTICLE III.   SECURITY ................................................................................... 10

   3.1   GRANT OF SECURITY INTEREST ........................................... 10

   3.2   PERFECTION; DUTY OF CARE ................................................ 10

   3.3   REAL PROPERTY COLLATERAL .............................................. 11

ARTICLE IV.   REPRESENTATIONS AND WARRANTIES ................................. 11

   4.1   DUE AUTHORIZATION; NO VIOLATION ................................. 11

   4.2   COMPLIANCE WITH LAW ........................................................ 12

   4.3   VALIDITY; ENFORCEABILITY ................................................. 12

   4.4   INSURANCE ................................................................................. 12

   4.5   ABSENCE OF LABOR DISPUTES ............................................. 12

   4.6   FORCE MAJEURE ....................................................................... 12

   4.7   INTELLECTUAL PROPERTY ..................................................... 12

ARTICLE V.   CONDITIONS ................................................................................ 13

   5.1   CONDITIONS OF INITIAL EXTENSION OF CREDIT .............. 13

   5.2   CONDITIONS OF EACH EXTENSION OF CREDIT .................. 14

ARTICLE VI.   AFFIRMATIVE COVENANTS ...................................................... 14

   6.1   PAYMENTS .................................................................................. 14

   6.2   ACCOUNTING RECORDS .......................................................... 14

   6.3   INFORMATION AND REPORTS ................................................. 15

   6.4   COMPLIANCE .............................................................................. 15

   6.5   MAINTENANCE OF PROPERTIES ............................................ 15

| | | |
|---|---|---|
| 6.6 | INSURANCE | 15 |
| 6.7 | MAINTAIN CASH MANAGEMENT SYSTEM | 15 |
| 6.8 | ACCESS | 16 |
| 6.9 | NOTICE TO LENDER | 16 |
| 6.10 | USE OF PROCEEDS | 16 |
| 6.11 | FURTHER ASSURANCES | 16 |
| ARTICLE VII. | NEGATIVE COVENANTS | 16 |
| 7.1 | CASH EXPENDITURES | 16 |
| 7.2 | CONSOLIDATIONS, MERGERS AND SALES OF ASSETS | 16 |
| 7.3 | PURCHASE OF ASSETS | 17 |
| 7.4 | EMPLOYMENT AGREEMENTS | 17 |
| 7.5 | CHANGE IN NATURE OF BUSINESS | 17 |
| 7.6 | TRANSACTIONS WITH AFFILIATES | 17 |
| ARTICLE VIII. | EVENTS OF DEFAULT | 17 |
| 8.1 | EVENTS OF DEFAULT | 17 |
| 8.2 | REMEDIES | 20 |
| ARTICLE IX. | MISCELLANEOUS | 21 |
| 9.1 | NOTICES | 21 |
| 9.2 | COSTS, EXPENSES, ATTORNEYS' FEES | 22 |
| 9.3 | WAIVER; INDEMNIFICATION | 22 |
| 9.4 | SUCCESSORS AND ASSIGNS | 23 |
| 9.5 | NO WAIVER; CUMULATIVE REMEDIES | 23 |
| 9.6 | AMENDMENT; INTEGRATION; EFFECTIVENESS | 23 |
| 9.7 | NO THIRD PARTY BENEFICIARIES | 24 |
| 9.8 | TIME | 24 |
| 9.9 | SEVERABILITY OF PROVISIONS | 24 |
| 9.10 | COUNTERPARTS | 24 |
| 9.11 | ATTORNEYS' FEES | 24 |
| 9.12 | GOVERNING LAW | 25 |
| 9.13 | WAIVER OF JURY TRIAL | 25 |

74117-0001/LEGAL18945665.3

**EXHIBITS**

A       Promissory Note Form
B       Notice of Borrowing
C       Notice of Authorized Representatives
D       Form of Interim Financing Order

## DEBTOR IN POSSESSION CREDIT AGREEMENT

THIS DEBTOR IN POSSESSION CREDIT AGREEMENT is entered into as of August __, 2010 by and between STATES INDUSTRIES, INC., debtor and debtor in possession ("**Borrower**"), and RENWOOD STATES LENDING, LLC., a Delaware limited liability company ("**Lender**").

## RECITALS

WHEREAS on August __, 2010 (the "**Petition Date**") Borrower filed a voluntary petition for relief (the "**Bankruptcy Case**") under Chapter 11 of the Bankruptcy Code with the United States Bankruptcy Court for the District of Oregon (the "**Bankruptcy Court**");

WHEREAS Borrower is continuing to operate its business and manage its property as debtor and debtor in possession under Sections 1107 and 1108 of the Bankruptcy Code;

WHEREAS Borrower is currently indebted to Lender pursuant to the terms of the Prepetition Loan Agreement (defined below);

WHEREAS Borrower has requested that Lender provide a secured super-priority credit facility of up to $1,500,000 in order to, among other purposes, fund the continued operation of its business; and

WHEREAS Lender is willing to make credit available to Borrower upon the terms and subject to the conditions set forth herein;

NOW, THEREFORE, in consideration of the mutual covenants and promises of the parties contained herein, Borrower and Lender hereby agree as follows:

## ARTICLE I.    DEFINITIONS

### 1.1    DEFINED TERMS

All terms defined above shall have the meanings set forth above.  The following terms shall have the meanings set forth below:

"**363 Sale**" means the proposed sale of substantially all of the assets of Borrower to Lender (or any higher bidder) pursuant to the terms of the Bid Procedures and the Sale Motion.

"**Advance**" has the meaning set forth in Section 2.1(a).

"**Agreement**" means this Debtor in Possession Credit Agreement as amended, modified or supplemented from time to time.

"**Applicable Rate**" means 15% per annum, provided that at all times during the continuation of an Event of Default, the Applicable Rate shall be 17% per annum.

"**Asset Purchase Agreement**" means the Asset Purchase Agreement to be entered into between Borrower and Lender pursuant to which Lender will purchase substantially all of the assets of Borrower.

"**Authorized Representative**" means a person designated as such by Borrower in a Notice of Authorized Representatives delivered to Lender.

"**Available Cash**" means, at any time, (a) Borrower's cash and cash equivalents that are free of Liens of any party plus (b) cash collateral that Borrower is authorized by order of the Bankruptcy Court to use, but (c) excluding cash being held for the purpose of providing for payment of taxes, government charges and employee-related taxes and charges.

"**Available Credit**" means, with respect to any week, the lesser of (a) the amount by which the Commitment exceeds the then outstanding Loan balance, or (b) an amount equal to the Cash Needs for such week, less the Available Cash as of the close of business of the immediately preceding week.

"**Bankruptcy Code**" means the Bankruptcy Reform Act, Title 11 of the United States Code, as amended or recodified from time to time, including (unless the context otherwise requires) any rules or regulations promulgated thereunder.

"**Bid Procedures Order**" means that certain order approving certain bid procedures for the sale of Borrower's assets, in a form reasonable satisfactory to Lender.

"**Borrower Milestones**" means the occurrence of the following events, each on or before the date set forth below:

      (i)     August 31, 2010 – the filing of the Sale Motion, in a form reasonably acceptable to Lender;

      (ii)     September 15, 2010 – entry of the Bid Procedures Order, in a form reasonably acceptable to Lender;

      (iii)     September 15, 2010 – execution of the Asset Purchase Agreement for the sale of substantially all of Borrower's assets;

      (iv)     October 20, 2010 – entry of the Sale Order, in a form reasonably acceptable to Lender;

      (v)     October 27, 2010 – closing of the sale contemplated by the Asset Purchase Agreement.

"**Business Day**" means any day other than a Saturday, Sunday or other day on which commercial banks are authorized or required to be closed in New York, New York.

"**Carve-Out**" means an amount equal to all amounts payable pursuant to 28 U.S.C. § 1930(a)(6) and any fees payable to the clerk of the Bankruptcy Court and (b) the Professional Fee Cap.

"**Cash Budget**" means a rolling 10-week detailed cash forecast for Borrower acceptable to Lender that is updated weekly and that includes reports that show the Borrower's sources and uses of cash from the prior week, and material variances associated therewith.

"**Cash Needs**" means, for any period, 110% of Borrower's projected cash needs set forth in the Cash Budget for such period.

"**Collateral**" means (a) all of Borrower's personal property and rights in and to property, including the Real Property and all Prepetition Collateral, accounts, instruments, chattel paper, deposit accounts, documents, general intangibles, goods (including inventory, equipment and fixtures), money, letter of credit rights, supporting obligations, investment property, commercial tort claims and records; (b) all products, proceeds, rents and profits of the foregoing; and (c) all of the foregoing, whether now owned or existing or hereafter acquired or arising or in which Borrower now has or hereafter acquires any rights; provided, however, "Collateral" shall not include the Excluded Assets.

"**Commitment**" means Lender's obligation to advance credit hereunder in an amount up to a total of $1,500,000.

"**Default**" means (i) an Event of Default, or (ii) an event or condition that with the giving of notice or the passage of time, or both, would constitute an Event of Default.

"**Disclosure Schedule**" means Schedule I attached hereto.

"**Effective Date**" means the date on which the conditions specified in Section 5.1 are satisfied.

"**Event of Default**" has the meaning set forth in Section 8.1 hereof.

"**Excluded Assets**" means (i) any retainers paid or deposited before the Petition Date by Borrower to or with its professionals for professional services and expense reimbursement in connection with the Bankruptcy Case; provided, however, that if such retainers are not fully consumed and are returned to Debtor for any reason, they shall be included in the definition of Collateral, and (ii) "Avoidance Actions" (as defined in the Interim Financing Order) to the extent the Interim Financing Order does not provide a Lien therein for the benefit of Lender to secure the Obligations.

"**Final Financing Order**" means an order of the Bankruptcy Court, in form and substance acceptable to Lender, which (a) contains substantially the same provisions as the Interim Financing Order (including reaffirming (x) that the Lender is extending credit to the Borrower in good faith (within the meaning of Section 364(e) of the Bankruptcy Code) under

this Agreement and (y) the granting of Liens and priority position provided in connection with the Interim Financing Order), (b) contains such additional provisions as required by the Lender, (c) is not subject to vacatur, amendment, modification, reversal or stay without the prior written consent of the Lender, and (d) reaffirms the grant of protections to be accorded to the Lender described herein.

"**Financing Order**" means the Interim Financing Order or the Final Financing Order.

"**GAAP**" means generally accepted accounting principles as in effect in the United States from time to time, consistently applied.

"**Governmental Authority**" means the government of the United States of America or any other nation, or of any political subdivision thereof, whether state or local, and any agency, authority, instrumentality, regulatory body, court, central bank or other entity exercising executive, legislative, judicial, taxing, regulatory or administrative powers or functions of or pertaining to government (including any supra-national bodies such as the European Union or the European Central Bank).

"**Governmental Rule**" means any applicable law, rule, regulation, treaty ordinance, order, code interpretation, judgment, decree, directive, guideline, policy or similar form of decision of any Governmental Authority.

"**Indemnified Party**" has the meaning set forth in Section 9.3 hereof.

"**Interim Financing Order**" means an order of the Bankruptcy Court in the form attached hereto as <u>Exhibit D</u> or otherwise acceptable to Lender.

"**Letter of Credit**" means letter of credit number 68029523/S528121 issued by Bank of America, N.A. to secure amounts which may be owing from time to time by Borrower to Safety National Casualty Corp., and all amendments and modifications thereof and letters of credit issued in replacement thereof, but in any only so long as Lender has any reimbursement obligation with respect thereto.

"**Lien**" means any mortgage, deed of trust, pledge, hypothecation, assignment, deposit arrangement, encumbrance, lien (statutory or other), security interest, priority or other security agreement or preferential arrangement of any kind or nature whatsoever, including any conditional sale or other title retention agreement and the interest of a lessor under a capital lease.

"**Loan**" means the aggregate outstanding principal balance of all Advances and all amounts added to such principal balance in accordance with the provisions of this Agreement.

"**Loan Documents**" means this Agreement, the Note and each other agreement, note, notice, document, contract or instrument to which Borrower now or hereafter is a party and that is required by Lender in connection with this Agreement or the credit extended

hereunder, including without limitation the Interim Financing Order and the Final Financing Order.

"**Material Adverse Effect**" means a material adverse effect on (a) the prospects for consummation of the 363 Sale, (b) the legality, validity, binding effect or enforceability against Borrower of any Loan Document to which it is a party or of the Financing Order, or (c) Lender's rights and remedies under any of the Loan Documents and the Financing Order.

"**Maturity Date**" means the first to occur of (a) October 29, 2010, (b) the effective date of a plan of reorganization or liquidation for Borrower, (c) the date that is 30 days after entry of the Interim Financing Order if the Final Financing Order has not been entered by that date, (d) the sale of a material portion of the Borrower's assets in one or more transactions under Section 363 of the Bankruptcy Code, or (e) the due date determined pursuant to Section 8.2.

"**Note**" means the promissory note executed by Borrower in favor of Lender evidencing the Loan, in the form attached as <u>Exhibit A</u> hereto.

"**Notice of Authorized Representatives**" has the meaning set forth in Section 2.4 hereof.

"**Notice of Borrowing**" has the meaning set forth in Section 2.1(c) hereof.

"**Obligations**" means all of Borrower's obligations under the Loan Documents, whether direct or indirect, absolute or contingent, due or to become due, now existing or hereafter arising.

"**Permit**" means any permit, approval, authorization, license, variance or permission required from a Governmental Authority under a Governmental Rule.

"**Permitted Liens**" means (a) Liens arising by operation of law (other than Liens imposed under ERISA or any Lien securing liability under any environmental Governmental Rule) for taxes, assessments or governmental charges not yet due; (b) statutory Liens of mechanics, materialmen, shippers, warehousemen, carriers, and other similar persons for services or materials arising in the ordinary course of business for which payment is not past due; (c) nonconsensual Liens incurred or deposits made in the ordinary course of business in connection with workers' compensation, unemployment insurance and other types of social security; (d) Liens granted in the Loan Documents; (e) zoning restrictions, easements, rights of way, survey exceptions, encroachments, covenants, licenses, reservations, leasehold interests, restrictions on the use of real property or minor irregularities incident thereto which do not in the aggregate materially detract from the value or use of the property or assets of Borrower or impair, in any material manner, the use of such property for the purposes for which such property is held by Borrower; (f) valid and perfected prepetition Liens of creditors; and (g) Liens granted in the Financing Order.

"**Person**" means any natural person, corporation, limited liability company, trust, joint venture, association, company, partnership, Governmental Authority or other entity.

"**Prepetition Collateral**" shall mean, collectively, (i) all "Collateral" as such term is defined in the Prepetition Loan Agreement, (ii) all other security for the Prepetition Obligations as provided in the Prepetition Loan Documents immediately prior to the Petition Date.

"**Prepetition Loan Agreement**" shall mean the Loan and Security Agreement dated as of May 3, 1999, by and between States Industries, Inc. and LaSalle Business Credit, the predecessor to Lender, as such agreement has been amended and modified from time to time.

"**Prepetition Loan Documents**" shall mean the Prepetition Loan Agreement, any and all promissory notes delivered by Borrower pursuant to the Prepetition Loan Agreement, all trust deeds and assignments of rent, guaranty agreements, security agreements, or other agreements executed by Borrower or affiliates of Borrower in connection with or relating to the Prepetition Loan Agreement.

"**Prepetition Obligations**" shall mean all loans and other loans, advances, letter of credit accommodations, debts, obligations, liabilities, indebtedness, covenants and duties of Borrower to Lender of every kind and description, however evidenced, whether direct or indirect, absolute or contingent, joint or several, secured or unsecured, due or not due, primary or secondary, liquidated or unliquidated, arising before the Petition Date and whether arising under or related to the Prepetition Loan Agreement and the Prepetition Loan Documents, by operation of law or otherwise and whether incurred by Borrower as principal, surety, endorser, guarantor or otherwise and including, without limitation, all principal, interest, financing charges, letter of credit fees, unused line fees, servicing fees, line increase fees, early termination fees, other fees, commissions, costs, expenses and attorneys', accountants' and consultants' fees and expenses incurred in connection with any of the foregoing.

"**Professionals**" means any attorneys, accountants, and other professionals retained in the Bankruptcy Case by Borrower or any official committee appointed by the United States Trustee pursuant to sections 327, 328 and 1103 of the Bankruptcy Code.

"**Professional Fee Cap**" means all allowed, unpaid postpetition fees and expenses of the Professionals not to exceed $300,000.00 without the prior written consent of the Lender.

"**Real Property**" means that certain real property subject to the following agreements: (a) Trust Deed, Assignment of Rents, Security Agreement, and Fixture Filing (Line of Credit Instrument) dated November 6, 2006, and recorded on November 22, 2006, in the Records of Lane County, Oregon, as Fee No. 2006-084207; (b)Trust Deed, Assignment of Rents, Security Agreement, and Fixture Filing (Line of Credit Instrument) dated June 30, 2004, and recorded on July 23, 2004 in the Records of Lane County, Oregon as Fee No. 2004-058309, as amended by that First Amendment to Trust Deed, Assignment of Rents, Security Agreement, and Fixture Filing (Line of Credit Instrument) dated September

2, 2004 and recorded on September 16, 2004 in the Records of Lane Count, Oregon as Fee No. 2004-072270, and further amended by the Second Amendment to Trust Deed, Assignment of Rents, Security Agreement, and Fixture Filing (Line of Credit Instrument) dated November 6, 2006 and recorded on November 22, 2006 in the Records of Lane Count, Oregon as Fee No. 2006-084203; and (c) Mortgage, Security Agreement and Financing Statement recorded on October 14, 2008, in the Bureau of Conveyances of the State of Hawaii, Document Number 2008-158556 given in favor of Assignor, as Mortgagee by Diane J. Montoya, wife of John Flynn, as Tenant in Severalty, as Mortgagor.

"**Sale Motion**" means that certain motion seeking approval of (i) certain bid procedures, (ii) the sale of substantially all of Borrower's assets to Lender or other purchaser and (iii) assumption and assignment of certain executory contracts and unexpired leases.

"**UCC**" means the Uniform Commercial Code as from time to time in effect in the applicable jurisdiction.

## 1.2    HEADINGS

Headings in this Agreement and each of the other Loan Documents are for convenience of reference only and are not part of the substance hereof or thereof.

## 1.3    GENERAL DEFINITIONAL PROVISIONS

The definitions of terms herein shall apply equally to the singular and plural forms of the terms defined.  Whenever the context may require, any pronoun shall include the corresponding masculine, feminine and neuter forms.  The words "include," "includes" and "including" shall be deemed to be followed by the phrase "without limitation."  The word "will" shall be construed to have the same meaning and effect as the word "shall."  Unless the context requires otherwise (a) any definition of or reference to any agreement, instrument or other document herein shall be construed as referring to such agreement, instrument or other document as from time to time amended, supplemented or otherwise modified (subject to any restrictions on such amendments, supplements or modifications set forth herein), (b) any reference herein to any Person shall be construed to include such Person's successors and assigns, (c) the words "herein," "hereof" and "hereunder," and words of similar import, shall be construed to refer to this Agreement in its entirety and not to any particular provision hereof, (d) unless otherwise specified, all references herein to Articles, Sections, Exhibits and Schedules shall be construed to refer to Articles and Sections of, and Exhibits and Schedules to, this Agreement, (e) any reference to any law or regulation herein shall, unless otherwise specified, refer to such law or regulation as amended, modified or supplemented from time to time, and (f) the words "asset" and "property" shall be construed to have the same meaning and effect and to refer to any and all tangible and intangible assets and properties, including cash, securities, accounts and contract rights.

## ARTICLE II.   THE CREDITS

### 2.1   THE LOAN

(a)   On the terms and subject to the conditions contained in this Agreement, Lender agrees to make loans (each an "Advance") to Borrower from time to time until the Maturity Date in an aggregate amount outstanding at any time not to exceed the Commitment.  No Advance shall exceed the Available Credit for the week in which the Advance is made.

(b)   Each Advance shall be made only on the first Business Day of a week. Borrower may request only one Advance in any week, and shall make a request only by giving Lender irrevocable written notice , in the form of <u>Exhibit B</u> attached hereto (each, a "Notice of Borrowing"), which specifies, among other things:

(i)   the aggregate principal amount of the requested Advance;

(ii)   the calculation of Available Credit for the week in which the Advance is to be made; and

(iii)   by reference to the current Cash Budget, the Cash Needs to be met with such Advance.

Each such Notice of Borrowing must be received by Lender not later than 4:00 p.m. (Central time) on the last Business Day prior to the week in which the Advance is to be made.

(c)   From time to time on any Business Day, Borrower may make a voluntary prepayment, in whole or in part, of the outstanding principal amount of the Loan without penalty or premium.  Any amount prepaid may be reborrowed in accordance with the provisions of this Section 2.1.

### 2.2   INTEREST; FEES; PAYMENTS

(a)   **Interest**.  The outstanding principal balance of the Loan shall bear interest at the Applicable Rate.  All fees, expenses and other amounts not paid when due shall bear interest (from the date due until paid) at the Applicable rate.

(b)   **Commitment Fee**.  On the Effective Date, Borrower shall pay Lender a commitment fee of $50,000.00.

(c)   **Computation and Payment**.  Interest and per annum fees shall be computed on the basis of a 360-day year, actual days elapsed and shall be payable monthly, in arrears, on the first Business Day of each month and on the Maturity Date.

(d)   **Place and Manner**.  All amounts due under the Loan Documents shall be payable to such account as Lender may designate from time to time.  Borrower shall make all payments in same day or immediately available funds not later than 11:00 a.m. (Central time)

on the date due.  All payments received on a Business Day shall be applied on such Business Day if received on or before 11:00 a.m. (Central time) or on the next Business Day if received after 11:00 a.m. (Central time), in either event subject to collection thereof in good funds.  Borrower shall make all payments due hereunder free and clear of, and without deduction or withholding for or on account of, any setoff, counterclaim, defense, duties, taxes, levies, imposts, fees, deductions, withholding, restrictions or conditions of any kind.  If after receipt of any payment of, or proceeds of Collateral applied to the payment of, any of the Obligations Lender is required to surrender or return such payment or proceeds to any Person for any reason, then the Obligations intended to be satisfied by such payment or proceeds shall be reinstated and continue and this Agreement shall continue in full force and effect as if such payment or proceeds had not been received by Lender.  Borrower hereby indemnifies and holds Lender harmless for the amount of any payments or proceeds surrendered or returned.  This Section 2.2(e) shall remain effective notwithstanding any contrary action that may be taken by Lender in reliance upon such payment or proceeds, and shall survive the payment in full and performance of all of Borrower's other Obligations.

(e)    **Application of Payments**.  All payments under the Loan Documents (including prepayments and proceeds of Collateral) shall be applied first to unpaid fees, costs and expenses, second to accrued interest then due and payable under the Loan Documents and finally to reduce the principal amount of the Loan, provided, however, during the continuation of an Event of Default, payments shall be applied in such order as Lender shall determine.

## 2.3    AUTHORIZED REPRESENTATIVES

On the Effective Date, and from time to time subsequent thereto at Borrower's option, Borrower shall deliver to Lender a notice in the form of Exhibit C attached hereto, which designates by name each of Borrower's Authorized Representatives and includes each of their respective specimen signatures (each, a "Notice of Authorized Representatives"). Lender shall be entitled to rely conclusively on the authority of each person designated as an Authorized Representative in the most current Notice of Authorized Representatives delivered by Borrower to Lender, to request borrowings and to give to Lender such other notices as are permitted hereunder, until such time as Lender has actual receipt of, a new Notice of Authorized Representatives.  Lender shall have no duty or obligation to Borrower to verify the authenticity of any signature appearing on any Notice of Borrowing or any other notice from an Authorized Representative.

## 2.4    LETTER OF CREDIT

Borrower shall indemnify and hold Lender harmless from and against any and all expenses, losses, claims, damages, and liabilities (including reasonable legal fees and other expenses) arising out of or in any way relating to the Letter of Credit or any reimbursement obligation of Lender with respect to the Letter of Credit.  If the issuer of the Letter of Credit has honored any full or partial drawing request under the Letter of Credit, Lender, in its discretion, may make an Advance to reimburse such issuer.  If on the Maturity Date the Letter of Credit remains outstanding and partially or wholly undrawn, Borrower shall, upon

Lender's request, provide cash collateral to Lender equal to 105% of the undrawn amount of the Letter of Credit, which cash collateral shall be part of the Collateral and shall continue to secure Borrower's indemnity obligations under this Section 2.4.  Borrower shall provide the required cash collateral either by delivering cash to be held by Lender as Collateral or by granting Lender a first priority security interest, in form and substance acceptable to Lender in its discretion, in a deposit account containing the required amount of funds.

## ARTICLE III.    SECURITY

### 3.1    GRANT OF SECURITY INTEREST

Borrower hereby grants to Lender a security interest in all of the Collateral as security for the full and prompt payment in cash and performance of the Obligations.  If requested by Lender, Borrower shall cause its wholly-owned subsidiary SI Properties, Inc., which is a borrower and guarantor of the Prepetition Obligation, to execute a guaranty, security agreement and second deed of trust to secure Borrower's obligations hereunder.

### 3.2    PERFECTION; DUTY OF CARE

(a)    Until all the Obligations have been paid in full and Lender's obligation to advance credit to Borrower terminated, Borrower shall perform all steps requested by Lender to perfect, maintain and protect Lender's security interest in the Collateral, including delivering to Lender all Collateral in which Lender's security interest may be perfected by possession together with such endorsements as Lender may request.

(b)    Borrower shall pay or cause to be paid all taxes, assessments and governmental charges levied or assessed or imposed upon or with respect to the Collateral or any part thereof; provided, however, Borrower shall not be required to pay any tax if the validity and/or amount thereof is being contested in good faith and by appropriate and lawful proceedings promptly initiated and diligently conducted of which Borrower have given prior notice to Lender and for which appropriate reserves have been established and so long as levy and execution have been and continue to be stayed.  If Borrower fail to pay or so contest and reserve for such taxes, assessments and governmental charges, Lender may (but shall not be required to) pay the same and add the amount of such payment to the principal of the Loan.

(c)    In order to protect or perfect the security interest granted under the Loan Documents, Lender may discharge any Lien that is not a Permitted Lien that under the Financing Order does not have a status superior to or *pari passu* with Lender's Lien in the Collateral or bond the same, pay for any insurance that Borrower fail to maintain as required by this Agreement, maintain guards, pay any service bureau, or obtain any record and add the same to the principal of the Loan.

(d)    Lender shall have no duty of care with respect to the Collateral, except to exercise reasonable care with respect to the Collateral in its custody, but shall be deemed to have exercised reasonable care if such property is accorded treatment substantially equal to

that which it accords its own property.  Lender's failure to take steps to preserve rights against any parties or property shall not be deemed to be a failure to exercise reasonable care with respect to the Collateral in its custody.

### 3.3      REAL PROPERTY COLLATERAL

Borrower hereby grants to Lender a security interest in the Real Property as security for the full and prompt payment in cash and performance of the Obligations.

### 3.4      CARVE-OUT

Notwithstanding anything in this Agreement or the Financing Orders to the contrary, any security interests granted to Lender and any administrative expense claims (superpriority or otherwise) granted or created pursuant to the operation of this Agreement or the Financing Orders shall be subordinate and subject only to the Carve-Out.  The Cash Budget includes budgeted amounts for payment of such fees and expenses of professionals.  Each week, Borrower shall deposit the budgeted amount of such payments into a separate bank account (the "Carve-Out Account").  The Carve-Out Account shall not be subject the Lender's claims, including any security interests or administrative expense claims granted to Lender, except to the extent there are funds left in the Carve-Out Account after payment of the Carve-Out; provided, however, that any payments actually made to the Professionals, whether under sections 330 and 331 of the Bankruptcy Code or otherwise, shall reduce the Professional Expense Cap on a dollar-for-dollar basis, irrespective of whether such payment was made pre-Event of Default or post-Event of Default, it being expressly understood that any prepetition retainers held by Professionals shall not count against, and shall not reduce, the Professional Expense Cap.  Notwithstanding anything to the contrary, the Carve-Out cannot be used for the payment or reimbursement of any fees or disbursements of Debtor incurred in connection with the assertion or joinder in any claim, counter-claim, action, proceeding, application, motion, objection, defense or other contested matter, the purpose of which is to seek any order, judgment, determination or similar relief invalidating, setting aside, avoiding, subordinating, in whole or in part, the Obligations or the Prepetition Obligation or lien and security interest securing the Obligations or the Prepetition Obligation; provided that the Carve-Out may be used by the Committee to investigate the Prepetition Obligation and the validity and perfection of the liens and security interests securing the Prepetition Obligation.

## ARTICLE IV.    REPRESENTATIONS AND WARRANTIES

Borrower makes the following representations and warranties to Lender as of the Effective Date and as of the date of each extension of credit hereunder:

### 4.1      DUE AUTHORIZATION; NO VIOLATION

Subject to the entry by the Bankruptcy Court of the Interim Financing Order (or the Final Financing Order, when applicable), Borrower's execution, delivery and performance of the Loan Documents are within its powers, have been duly authorized by all necessary

action, and do not (a) contravene its articles of incorporation or bylaws, (b) contravene any contractual restriction or Governmental Rule binding on or affecting it, or (c) result in, or require the creation or imposition of, any Lien on its property, except Liens for the benefit of Lender.

### 4.2    COMPLIANCE WITH LAW

Borrower is in compliance with all Governmental Rules, except where the failure to do so would not reasonably be expected to have a Material Adverse Effect.

### 4.3    VALIDITY; ENFORCEABILITY

Upon entry by the Bankruptcy Court of the Interim Financing Order (or the Final Financing Order, when applicable), the Loan Documents constitute, the legal, valid and binding obligations of Borrower enforceable against it in accordance with their respective terms.

### 4.4    INSURANCE

All current policies of insurance of any kind or nature owned by or issued to Borrower, including policies of fire, theft, product liability, public liability, property damage, other casualty, employee fidelity, directors' and officers' liability, workers' compensation and employee health and welfare insurance, are in full force and effect and are of a nature and provide such coverage as is sufficient and as is customarily carried by businesses owning or operating properties similar to Borrower's properties.  Borrower has no reason to believe that it will be unable to comply with Sections 6.5 and 6.6.

### 4.5    ABSENCE OF LABOR DISPUTES

No strikes, boycotts, work stoppages or labor disputes with Borrower's employees exist or, to Borrower's knowledge, are imminent or would reasonably be expected to occur that would reasonably be expected to have a Material Adverse Effect.

### 4.6    FORCE MAJEURE

None of Borrower's business or properties is suffering from the effects of any fire, explosion, accident, strike, lockout or other labor dispute, drought, storm, hail, earthquake, embargo, act of God or of the public enemy or other casualty (whether or not covered by insurance), other than those the consequences of which in the aggregate would not reasonably be expected to have a Material Adverse Effect.

### 4.7    INTELLECTUAL PROPERTY

Borrower owns or licenses or otherwise has the right to use all material licenses, Permits, patents, patent applications, trademarks, trademark applications, service marks, trade names, copyrights, copyright applications, franchises, authorizations and other intellectual property rights and general intangibles that are necessary for the operation of its

businesses, without infringement upon or conflict with the rights of any other Person with respect thereto, including all trade names, which infringement or conflict would reasonably be expected to have a Material Adverse Effect.  No slogan or other advertising device, product, process, method, substance, part or other material now employed, or now contemplated to be employed, by Borrower infringes upon or conflicts with any rights owned by any other Person, which infringement or conflict would reasonably be expected to have a Material Adverse Effect, and no claim or litigation regarding any of the foregoing is pending or, to its knowledge, threatened, the existence of which would reasonably be expected to have a Material Adverse Effect.

## ARTICLE V.    CONDITIONS

### 5.1    CONDITIONS OF INITIAL EXTENSION OF CREDIT

Lender's obligation to make the initial extension of credit contemplated by this Agreement is subject to the fulfillment to Lender's satisfaction of all of the following conditions:

(a)    **Documentation**.  Lender shall have received each of the following duly executed:

(i)    this Agreement, the Note, a Notice of Authorized Representatives, a Notice of Borrowing, and a Cash Budget, the first week of which includes the Effective Date;

(ii)    from Borrower, a certificate of its secretary or assistant secretary dated as of the date of this Agreement as to:  (A) resolutions of its board of directors then in full force and effect authorizing the execution, delivery and performance of each Loan Document to be executed by it; (B) its bylaws, a copy of which is attached; and (C) the incumbency and signatures of those of its officers authorized to act with respect to the Loan Documents to be executed by it; and

(iii)    evidence of insurance coverage, including loss payable endorsements, acceptable to Lender.

(b)    **Interim Financing Order**.  The Interim Financing Order shall be in full force and effect and shall not have been vacated, stayed, reversed, modified or amended in any respect that Lender deems to be materially adverse to its interest; and, if the Interim Financing Order is the subject of a pending appeal in any respect, neither the making of the Loan, the granting of the security interest in the Collateral, nor the performance of Borrower under the Loan Documents shall be subject to a presently effective stay pending appeal.

(c)    **Fees and Expenses**.  Borrower shall have paid all fees and invoiced costs and expenses then due pursuant to the terms of this Agreement, which fees, costs and expenses shall be paid out of the proceeds of the initial Advance.

### 5.2    CONDITIONS OF EACH EXTENSION OF CREDIT

Lender's obligation to make any credit available under the Loan Documents (including any Advance to be made on the Effective Date) shall be subject to the further conditions precedent that:

(a)    the following statements shall be true on the date such credit is advanced, both before and after giving effect thereto and to the application of the proceeds therefrom, and the acceptance by Borrower of the proceeds of such credit shall constitute a representation and warranty by Borrower that on the date such credit is advanced such statements are true:

(i)    Borrower's representations and warranties contained in the Loan Documents are correct in all material respects on and as of such date as though made on and as of such date or, as to those representations and warranties limited by their terms to a specified date, were correct in all material respects on and as of such date; and

(ii)    no Default is continuing or would result from the credit being advanced;

(b)    advancing the requested credit on such date does not violate any Governmental Rule and is not enjoined, temporarily, preliminarily or permanently;

(c)    Lender shall have received a Notice of Borrowing with respect to the requested Advance; and

(d)    no event or circumstance exists that can reasonably be expected to have a Material Adverse Effect.

### ARTICLE VI.    AFFIRMATIVE COVENANTS

Borrower covenants that until performance and payment in full of all Obligations and termination of Lender's obligation to advance credit to Borrower, Borrower shall:

### 6.1    PAYMENTS

Pay all principal, interest, fees and other liabilities due under any of the Loan Documents at the times and place and in the manner specified therein.

### 6.2    ACCOUNTING RECORDS

Keep accurate books and records of its financial affairs sufficient to permit the preparation of financial statements therefrom in accordance with GAAP.

### 6.3        INFORMATION AND REPORTS

Deliver to Lender on the Friday of each week, a revised Cash Budget for the period beginning on the first day of the following week and from time to time such other reports, analysis, documents and information as Lender may reasonably request, incuding those set forth on Exhibit E.

### 6.4        COMPLIANCE

Except as otherwise permitted by Lender, preserve and maintain all licenses, Permits, governmental approvals, rights, privileges, franchises and general intangibles necessary for the conduct of its business and comply in all material respects with all Governmental Rules, other than such failure to do so the consequences of which in the aggregate would not reasonably be expected to have a Material Adverse Effect.

### 6.5        MAINTENANCE OF PROPERTIES

(a)        Maintain all properties used or useful in the conduct of its business in good condition, repair and working order and supply such properties with all necessary equipment and make all necessary repairs, renewals, replacements, betterments and improvements thereto, all as in the judgment of the Borrower may be necessary so that the business carried on in connection therewith may be properly and advantageously conducted at all times; provided, however, that nothing in this Section 6.5(a) shall prevent Borrower from discontinuing the operation and maintenance of any such properties if such discontinuance is implemented with the consent of Lender.

(b)        Except to the extent the failure to do so would not reasonably be expected to have a Material Adverse Effect, maintain all properties and operate its business in such a manner that the representations in Sections 4.5 and 4.7 continue to be true and correct at all times.

### 6.6        INSURANCE

Insure and keep insured, with reputable, financially sound insurance companies, its properties, business and operations in such amounts, with such deductibles and covering such risks as are insured against and carried in accordance with applicable law and prudent industry practice by businesses owning or operating similar properties, and providing for not less than thirty days' prior notice to Lender of termination, lapse or cancellation of such insurance.

### 6.7        MAINTAIN CASH MANAGEMENT SYSTEM

Except to the extent the Financing Orders or Bankruptcy Court requires otherwise maintain Borrower's current cash management system and accounts.

### 6.8    ACCESS

Permit Lender and any of its agents, advisors, auditors and employees (i) full and reasonable access to Borrower's books, records and places of business to verify the existence, condition and location of property in which Lender has a Lien, and (ii) with reasonable access during normal business hours to all places of business, officers, consultants and employees of Borrower.

### 6.9    NOTICE TO LENDER

Promptly (but in no event more than one Business Day after Borrower has knowledge of the occurrence of each such event or matter) give notice to Lender in reasonable detail of: (i) the occurrence of any Default; (ii) any termination or cancellation of any insurance policy which Borrower are required to maintain, unless such policy is replaced without any break in coverage with an equivalent or better policy; (iii) the commencement of any labor controversy; or (iv) the occurrence of any event that would reasonably be expected to have a Material Adverse Effect.

### 6.10    USE OF PROCEEDS

Use the proceeds of the Advances solely to fund Cash Needs in accordance with the Financing Order.

### 6.11    FURTHER ASSURANCES

At Lender's request at any time and from time to time, duly execute and deliver such further agreements, documents and instruments, and do or cause to be done such further acts as may reasonably be necessary or proper to evidence, perfect, maintain and enforce the security interests and the priority thereof in the Collateral and to otherwise effectuate the provisions or purposes of the Loan Documents, at Borrower's expense.

## ARTICLE VII.    NEGATIVE COVENANTS

Borrower covenants that until performance and payment in full of all Obligations and termination of Lender's obligations to advance credit to Borrower, Borrower shall not, without Lender's consent:

### 7.1    CASH EXPENDITURES

Make any expenditure (including any capital expenditure) other than those set forth in the Cash Budget, subject only (with respect to non-capital expenditures) to variances therefrom not exceeding 10% in the aggregate since the Effective Date;

### 7.2    CONSOLIDATIONS, MERGERS AND SALES OF ASSETS

(a)    Except as contemplated by the 363 Sale, consolidate or merge with or into any Person, or sell, lease or otherwise transfer, directly or indirectly, all or substantially all of its

property and assets (as an entirety or substantially as an entirety in one transaction or a series of related transactions), or

(b)      Make any sale, lease or other disposition of any asset, except (i) sales of goods and services in the ordinary course of business, (ii) the sale, lease or other disposition of worn out, obsolete and surplus assets, (iii) the sale, lease, abandonment, return, or other disposition of assets that are not intended to be used in continuing operations following consummation of the 363 Sale, and (iv) the use of cash and cash equivalents to make expenditures contemplated by the Cash Budget.

### 7.3      PURCHASE OF ASSETS

Acquire any assets other than in the ordinary course of business or acquire or create any subsidiary.

### 7.4      EMPLOYMENT AGREEMENTS

Enter into an employment agreement with any member of Borrower's management.

### 7.5      CHANGE IN NATURE OF BUSINESS

Directly or indirectly engage in any business activity other than its current business activity.

### 7.6      TRANSACTIONS WITH AFFILIATES

Enter into any transaction directly or indirectly with or for any affiliate except in the ordinary course of business on a basis no less favorable to such affiliate than would be obtained in a comparable arm's length transaction with a Person not an affiliate.

## ARTICLE VIII.  EVENTS OF DEFAULT

### 8.1      EVENTS OF DEFAULT

The occurrence of any of the following shall constitute an "Event of Default":

(a)      <u>Payment</u>.  Borrower fails to pay any payment Obligation when due;

(b)      <u>Certain Covenants</u>.  Borrower fails to observe or perform any covenant contained in Sections 6.6, 6.7, 6.8, 6.9 (provided that if the event that was required to be the subject of any such notice is waived or cured to the satisfaction of Lender, the failure to have given the required notice shall thereafter not be a continuing Event of Default), 6.10, and Article VII;

(c)      <u>Other Covenants</u>.  Borrower fails to observe or perform any covenant or agreement contained in the Loan Documents (other than those covered by Sections

8.1(a) and (b)) for three days after notice thereof has been given to Borrower by the Lender;

(d)    <u>Representations</u>.  Any representation, warranty, certification or statement made by Borrower in any Loan Document or in any certificate, financial statement or other document delivered pursuant to the Loan Documents is false or misleading in any respect (or in any material respect if such representation, warranty, certification or statement is not by its terms already qualified as to materiality) when made (or deemed made);

(e)    <u>Weekly Sales</u>.  Borrower's weekly sales figures shall be less than those projected in the Budget by more than 10% for any one week or more 15% in the aggregate.

(f)    <u>Liens</u>.  The Lien created by any of the Loan Documents and Financing Orders ("DIP Liens") shall at any time fail to constitute a valid and perfected Lien on all of the Collateral purported to be secured thereby, subject to no prior or equal Lien except those Permitted Liens, if any, that have a priority superior to the DIP Liens under the Financing Order, or Borrower shall so assert in writing;

(g)    <u>Conduct of Business</u>.  Borrower shall be prohibited or otherwise materially restrained from conducting the business currently conducted by it by virtue of any determination, ruling, decision, decree or order of any court or regulatory authority of competent jurisdiction and such determination, ruling, decision, decree or order remains unstayed and in effect for any period of 10 days, or Borrower shall cease the business currently conducted by it;

(h)    <u>Loan Documents</u>.  Any of the Loan Documents shall for any reason fail to constitute the valid and binding agreement of Borrower, or Borrower shall so assert in any pleading filed in any court;

(i)    <u>Dismissal or Conversion of Bankruptcy Case</u>.  The Bankruptcy Court shall enter an order dismissing the Bankruptcy Case or converting it to a case under Chapter 7 of the Bankruptcy Code, or appointing a trustee, responsible officer (other than John Davidson as Chief Restructuring Officer) or an examiner with enlarged powers relating to the operation of Borrower's business (beyond those set forth in Section 1106(a)(3) or (4) of the Bankruptcy Code) under Bankruptcy Code Section 1106(b), and the order appointing such trustee, responsible officer or examiner shall not be reversed or vacated within three days after the entry thereof;

(j)    <u>Relief From Stay</u>.  Entry of an order granting relief from the automatic stay applicable under Section 362 of the Bankruptcy Code to the holder of any claim against Borrower, which order enables the holder of such claim to exercise any right or remedy against any of Borrower's property that Lender determines is material to the 363 Sale;

(k)     <u>Modification of Financing Orders</u>.  Without Lender's consent, entry of an order in the Bankruptcy Case amending, supplementing, staying for a period in excess of three days, vacating or otherwise modifying any Financing Order;

(l)     <u>Contest of Claims</u>.  Borrower shall support (in any such case by way of any motion or other pleading filed with the court or any other writing to another party-in-interest executed by or on behalf of Borrower) any other Person's opposition to, any motion made by Lender seeking confirmation of the amount of Lender's claim or the validity and enforceability of the Liens in favor of Lender;

(m)     <u>Disallowance of Claims</u>.  Borrower shall seek to, or shall support (in any such case by way of motion or other pleading filed with the court or any other writing to another party-in-interest executed by or on behalf of Borrower) any other Person's motion to, disallow, or challenge in any fashion the validity and enforceability of the Liens in favor of Lender;

(n)     <u>Interim Financing Order</u>.  From and after the date of entry thereof, the Interim Financing Order shall cease to be in full force and effect (or shall have been vacated, stayed for a period in excess of three days, reversed, modified or amended), in each case without Lender's consent, and the Final Financing Order shall not have been entered prior to such cessation (or vacatur, stay, reversal, modification or amendment);

(o)     <u>Final Financing Order</u>.  The Final Financing Order shall not have been entered by the Bankruptcy Court on or before the date that is 30 days after entry of the Interim Financing Order, or from and after the date of entry thereof, the Final Financing Order shall cease to be in full force and effect (or shall have been vacated, stayed for a period in excess of three days, reversed, modified or amended), in each case without the consent of Lender;

(p)     <u>Failure to Comply with Financing Orders</u>.  Borrower fail to comply with the terms of any Financing Order;

(q)     <u>Borrower Milestones</u>.  Any Borrower Milestone is not completed or achieved on the dated specified for such milestone;

(r)     <u>Material Adverse Effect</u>.  The occurrence of event(s) or circumstances having a Material Adverse Effect;

(s)     <u>Superpriority</u>.  The entry of an order granting any other claim superpriority status or a Lien equal or superior to that granted to Lender, other than as provided in the Financing Order or consented to by Lender;

(t)     <u>Impairment</u>.  Borrower files any motion or proceeding that would reasonably be expected to result in material impairment of the Lender's rights under this Agreement, or a final determination by any other court of competent jurisdiction

with respect to any motion or proceeding brought by any other party that results in any material impairment of the Lender's rights under any Loan Document; or

(u)    <u>Unacceptable Section 363 Sale</u>.  Without Lender's consent, Borrower enters into or purports to enter into an agreement pursuant to which Borrower would sell assets, except sales of goods and services in the ordinary course of business or as otherwise permitted in Section 7.2

## 8.2    REMEDIES

(a)    During the continuance of an Event of Default, Lender may, notwithstanding the provisions of Section 362 of the Bankruptcy Code, but subject to the provisions of the Financing Orders, without any application, motion or notice to, or order from, the Bankruptcy Court:

(i)    terminate or suspend its obligation to advance credit hereunder, and/or declare the Obligations to be due and payable, whereupon the Obligations shall become immediately due and payable, without presentment, demand, protest or notice of any kind, all of which Borrower expressly waives; and/or

(ii)    the automatic stay imposed by Section 362(a) of the Bankruptcy Code shall be lifted with respect to the Lender at 5:00 p.m. Prevailing Pacific time on the third business day after written notice by the Lender to the Borrower, the United States Trustee and any committee, so that the Lender may exercise any or all of the following rights and remedies:  (A) all the rights and remedies of a secured party under the UCC and all other applicable law, all of which rights and remedies shall be cumulative and nonexclusive to the extent permitted by law;  (B) all of the rights and remedies provided for in the Loan Documents; and  (C) without notice, sell, lease, assign, grant an option or options to purchase or otherwise dispose of the Collateral or any part thereof in one or more parcels at public or private sale, for cash, on credit or for future delivery, and upon such other terms as Lender deems commercially reasonable.  Lender shall be entitled to apply the proceeds of the Prepetition Collateral and the Collateral in accordance with the provisions of this Agreement.

(b)    Upon Lender's request during the continuance of an Event of Default, and notwithstanding the provisions of Section 362 of the Bankruptcy Code, but subject to the provisions of the Financing Orders, without any application, motion or notice to, or order from, the Bankruptcy Court, the Borrower shall:

(i)    assemble and make available to Lender the Collateral and all records relating thereto at any place or places specified by Lender; and

(ii)    permit Lender and Lender's representatives to enter any premises where any of the Collateral, or books and records relating thereto, are located, to take possession of all or any part of the Collateral and to remove all or any part of the Collateral.

(c)     Lender may comply with any Governmental Rule in connection with the disposition of the Collateral and such compliance shall not be considered to adversely affect the commercial reasonableness of any sale or other disposition of the Collateral.

(d)     Borrower hereby waives notice of the time and place of any public sale or the time after which any private sale or other disposition of all or any part of the Collateral may be made.  To the extent such notice may not be waived under applicable law, any notice made shall be deemed reasonable if sent to Borrower in accordance with Section 9.1, at least ten days prior to (i) the date of any such public sale, or (ii) the time after which any such private sale or other disposition may be made.  Lender shall have no obligation to clean-up or otherwise prepare the Collateral for sale.

(e)     During the continuance of an Event of Default, Lender shall be entitled to occupy and use any premises owned or leased by Borrower where any of the Collateral or any records relating to the Collateral are located until the Obligations are paid in full or the Collateral is removed therefrom, whichever first occurs, without any obligation to pay Borrower for such use and occupancy.

(f)     Lender is hereby granted a license and right to use, without charge upon the occurrence and during the continuance of an Event of Default and until the Obligations are fully paid and Lender's obligation to advance credit hereunder terminated, Borrower's labels, patents, copyrights, rights of use of any name, trade secrets, trade names, trademarks, service marks, advertising material, general intangibles or any property of a similar nature in completing the production, advertising for sale and sale or other disposition of any Collateral.

(f)     Lender shall have no obligation (i) to preserve any rights to the Collateral against any Person, (ii) to make any demand upon or pursue or exhaust any rights or remedies against Borrower or others with respect to payment of the Obligations, (iii) to pursue or exhaust any rights or remedies with respect to any of the Collateral or any other security for the Obligations, or (iv) to marshal any assets in favor of Borrower or any other Person against or in payment of any or all of the Obligations.

## ARTICLE IX.     MISCELLANEOUS

### 9.1          NOTICES

Any notice required or permitted to be given hereunder will be in writing, will be addressed to the party to be notified at the address set forth below, or at such other address as each party may designate for itself from time to time by notice hereunder, and will be deemed to have been validly given (i) five days following deposit in the United States mail, with proper first-class postage prepaid, (ii) the next Business Day after notice was delivered to a regularly scheduled overnight delivery carrier, or (iii) upon receipt of notice given by fax or personal delivery:

| To Borrower: | States Industries, Inc.<br>29545 East Enid Road<br>Eugene, Oregon 97401<br>Attn:  John Davidson, Chief Restructuring Officer<br>Fax No.:  (541) 689-7490<br>Email:  jdavidson.states@invernessgroupllc.com |
| --- | --- |
| With a copy to: | Brad T. Summers<br>Ball Janik LLP<br>One Main Place<br>101 SW Main St, Suite 1100<br>Portland, OR  97204<br>Fax No:  (503) 295-1058<br>Email: tsummers@balljanik.com |
| To Lender: | Renwood States Lending, LLC<br>One Park Plaza<br>Suite 600<br>Irvine, CA  92614<br>Attn:  Mark Barbeau<br>Fax No.:  (714) 464-4799<br>Email:  mark.barbeau@renovocap.com |
| With a copy to: | Jeanette L. Thomas<br>Perkins Coie LLP<br>1120 NW Couch Street, 10th Floor<br>Portland, OR 97209<br>Fax No:  (503) 727-2000<br>Email: jthomas@perkinscoie.com |

### 9.2    COSTS, EXPENSES, ATTORNEYS' FEES

Borrower shall pay immediately upon demand the full amount of all payments, advances, charges, costs and expenses, including reasonable attorneys' fees, incurred by Lender in connection with (a) the negotiation and preparation of the Loan Documents, (b) the enforcement, preservation or protection (or attempted enforcement, preservation or protection) of Lender's rights, including periodic collateral examinations, and/or the collection of any amounts which become due under any of the Loan Documents, and (c) the prosecution or defense of any action in any way related to any of the Loan Documents, including any action for declaratory relief.

### 9.3    WAIVER; INDEMNIFICATION

(a)    Borrower hereby waives any and all claims and causes of action against Lender and its agents, affiliates, subsidiaries, directors, officers, representatives, attorneys or

advisors, directly related to the Obligations, any Financing Order or the negotiation of the terms hereof or of any Financing Order.

(b)    Borrower shall indemnify and hold harmless the Lender and its directors, officers, employees, agents, advisors, controlling persons, and affiliates (each an "Indemnified Party") from and against any and all expenses, losses, claims, damages, and liabilities (including reasonable legal fees and other expenses) incurred by such Indemnified Party arising out of claims made by any Person in any way relating to the transactions contemplated hereby or the use of the proceeds of extensions of credit hereunder, but excluding therefrom all expenses, losses, claims, damages and liabilities to the extent that they are determined by the final judgment of a court of competent jurisdiction to have resulted from the gross negligence or willful misconduct of such Indemnified Party.  No Indemnified Party shall be liable for any special, indirect, consequential or punitive damages in connection with this Agreement, the other Loan Documents, agreements or the transaction contemplated hereby or thereby.

(c)    Borrower's obligations under this Section 9.3 shall survive the termination of this Agreement and the satisfaction of the other Obligations.

### 9.4    SUCCESSORS AND ASSIGNS

(a)    The Loan Documents shall be binding upon and inure to the benefit of the successors and assigns of the parties; provided, however, that Borrower may not assign or otherwise transfer its interest or obligations hereunder.  Lender reserves the right to sell, assign, transfer, negotiate or grant participations in all or any part of, or any interest in, Lender's rights and benefits under each of the Loan Documents.

(b)    Without limitation, Lender may disclose any financial or other information relating to Borrower, to its affiliates, auditors and legal counsel, to any potential participant or assignee and to any Governmental Authority.

### 9.5    NO WAIVER; CUMULATIVE REMEDIES

No failure on the part of Lender to exercise, and no delay in exercising, any right, power, privilege or remedy under any Loan Document shall operate as a waiver thereof; nor shall any single or partial exercise of any such right, power, privilege or remedy preclude any other or further exercise thereof or the exercise of any other right, power, privilege or remedy.  The rights and remedies under the Loan Documents are cumulative and not exclusive of any rights, powers, privileges and remedies that may otherwise be available to Lender.

### 9.6    AMENDMENT; INTEGRATION; EFFECTIVENESS

No amendment or waiver of any provision of any Loan Document shall be effective unless in writing and signed by the party against whom enforcement is sought.  Lender's failure to insist upon the strict performance of any provision of any Loan Document, or to

exercise any right or remedy consequent upon a breach thereof, shall not constitute a waiver of any such breach or of any subsequent breach of the same or any other provision.  No waiver of any provision of any Loan Document shall be deemed a waiver of any other provision of any Loan Document or a waiver of such provision with respect to any subsequent breach, unless expressly provided in writing

### 9.7    NO THIRD PARTY BENEFICIARIES

This Agreement is made and entered into for the sole protection and benefit of the parties hereto and their respective permitted successors and assigns, and no other person or entity shall be a third party beneficiary of, or have any direct or indirect cause of action or claim in connection with, this Agreement or any other of the Loan Documents to which it is not a party.

### 9.8    TIME

Time is of the essence of each and every provision of this Agreement and each other of the Loan Documents.

### 9.9    SEVERABILITY OF PROVISIONS

If any provision of this Agreement shall be prohibited by or invalid under applicable law, such provision shall be ineffective only to the extent of such prohibition or invalidity without invalidating the remainder of such provision or any remaining provisions of this Agreement.

### 9.10    COUNTERPARTS

To facilitate execution, this Agreement may be executed in as many counterparts as may be convenient or required.  It shall not be necessary that the signature of each party appear on each counterpart.  All counterparts shall collectively constitute a single instrument. It shall not be necessary in making proof of this Agreement to produce or account for more than a single counterpart containing the respective signatures of each of the parties hereto. Any signature page to any counterpart may be detached from such counterpart without impairing the legal effect of the signatures thereon and thereafter attached to another counterpart identical thereto except having attached to it additional signature pages. Delivery of an executed counterpart of a signature page of this Agreement by fax or other electronic imagining means shall be effective as delivery of a manually executed counterpart of this Agreement.

### 9.11    ATTORNEYS' FEES

References in the Loan Documents to fees and expenses of attorneys or counsel shall include all such reasonable fees and expenses, whether incurred at the trial or appellate level, in an arbitration or administrative proceeding, in bankruptcy (including, without limitation, any adversary proceeding, contested matter or motion) or otherwise incurred.

**9.12      GOVERNING LAW**

This Agreement shall be governed by and construed in accordance with the laws of the State of Oregon, without regard to the conflict of laws provisions thereof.

**9.13      WAIVER OF JURY TRIAL**

BORROWER AND LENDER EACH, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, HEREBY IRREVOCABLY WAIVES ALL RIGHT TO A TRIAL BY JURY IN ANY ACTION, PROCEEDING, COUNTERCLAIM OR OTHER LITIGATION IN ANY WAY ARISING OUT OF OR RELATING TO THIS AGREEMENT, ANY OTHER OF THE LOAN DOCUMENTS OR ANY OF THE TRANSACTIONS OR EVENTS REFERENCED HEREIN OR THEREIN OR CONTEMPLATED HEREBY OR THEREBY, WHETHER WITH RESPECT TO CONTRACT CLAIMS, TORT CLAIMS OR OTHERWISE.  THIS WAIVER SHALL APPLY TO ANY SUBSEQUENT AMENDMENTS, RENEWALS, SUPPLEMENTS OR MODIFICATIONS TO THIS AGREEMENT AND/OR ANY OTHER OF THE LOAN DOCUMENTS.  A COPY OF THIS SECTION MAY BE FILED WITH ANY COURT AS WRITTEN EVIDENCE OF THE WAIVER OF THE RIGHT TO TRIAL BY JURY AND THE CONSENT TO TRIAL BY COURT.

**UNDER OREGON LAW, MOST AGREEMENTS, PROMISES AND COMMITMENTS MADE BY LENDER CONCERNING LOANS AND OTHER CREDIT EXTENSIONS WHICH ARE NOT FOR PERSONAL, FAMILY OR HOUSEHOLD PURPOSES OR SECURED SOLELY BY BORROWER'S RESIDENCE MUST BE IN WRITING, EXPRESS CONSIDERATION AND BE SIGNED BY LENDER TO BE ENFORCEABLE.**

**IN WITNESS WHEREOF**, this Debtor in Possession Credit Agreement has been duly executed as of the date first written above.


RENWOOD STATES LENDING, LLC          STATES INDUSTRIES, INC., debtor and
                                     debtor in possession


By:_____          By:_____
Title:_____          Title:_____

**EXHIBIT A**
**TO**
**DEBTOR IN POSSESSION CREDIT AGREEMENT**

**Promissory Note**

$1,500,000                                                                                        August __, 2010

FOR VALUE RECEIVED, the undersigned, States Industries, Inc., debtor and debtor in possession ("Borrower"), hereby promises to pay to the order of Renwood States Lending, LLC, a Delaware limited liability company ("Lender"), on the Maturity Date, or at such earlier time as is provided in that certain Debtor in Possession Credit Agreement between Borrower and Lender of even date herewith, (as amended, modified or supplemented from time to time, the "Credit Agreement"), the principal sum of One Million Five Hundred Dollars ($1,500,000), or such lesser amount as shall equal the aggregate outstanding principal balance of the Loan made by Lender to Borrower pursuant to the Credit Agreement.

This promissory note is subject to the terms of, the Credit Agreement.  Capitalized terms used herein shall have the respective meanings assigned to them in the Credit Agreement.

Borrower further promises to pay interest on the outstanding principal balance hereof at the interest rates, and payable on the dates, set forth in the Credit Agreement.  All payments of principal and interest hereunder shall be made to Lender in lawful money of the United States and in same day or immediately available funds.

Lender is authorized but not required to record the date and amount of each Advance, the date and amount of each payment of principal and interest hereunder, and the resulting unpaid principal balance hereof, in Lender's internal records, and any such recordation shall be prima facie evidence of the accuracy of the information so recorded; provided however, that Lender's failure to so record such amounts shall not limit or otherwise affect Borrower's obligations hereunder and under the Credit Agreement to repay the principal hereof and interest hereon.

Borrower shall pay all costs of collection, including reasonable attorneys' fees, whether incurred at the trial or appellate level, in an arbitration or administrative proceeding, in bankruptcy (including, without limitation, any adversary proceeding, contested matter or motion) or otherwise incurred.  No delay or failure on the part of Lender to exercise any of its rights hereunder shall be deemed a waiver of such rights or any other right of Lender nor shall any delay, omission or waiver on any one occasion be deemed a bar to or waiver of such rights or any other right on any future occasion.  Borrower and every surety, indorser

and guarantor of this Note waive presentment, demand, protest, notice of intention to accelerate, notice of acceleration, notice of nonpayment and all other notices of every kind, and agree that their liability under this Note shall not be affected by any renewal, postponement or extension in the time of payment hereof, by any indulgence granted by any holder hereof with respect hereto, or by any release or change in any security for the payment of this Note, and they hereby consent to any and all renewals, extensions, indulgences, releases or changes, regardless of the number of such renewals, extensions, indulgences, releases or changes.

The Credit Agreement provides, among other things, for acceleration of the maturity hereof upon the occurrence of certain stated events, in each case without presentment, demand, protest or further notice of any kind, all of which are hereby expressly waived by Borrower.

Borrower's obligations evidenced by this promissory note are secured by the collateral described in the Loan Documents.  The Loan Documents describe the rights of Lender and any other holder hereof with respect to the collateral.

In the event of any conflict between the terms of this promissory note and the terms of the Credit Agreement, the terms of the Credit Agreement shall control.

This promissory note shall be governed by and construed in accordance with the laws of the State of Oregon, without regard to the conflict of laws provisions thereof.

STATES INDUSTRIES, INC., debtor and debtor in possession

By:_____
Title:_____

**EXHIBIT B**
**TO**
**DEBTOR IN POSSESSION CREDIT AGREEMENT**

**Notice of Borrowing**

Renwood States Lending, LLC
One Park Plaza
Suite 600
Irvine, CA  92614
Attn:  Mark Barbeau


   Reference is made to that certain Debtor in Possession Credit Agreement States Industries, Inc., debtor and debtor in possession and Renwood States Lending, LLC, a Delaware corporation, dated as of August __, 2010, (as amended, modified or supplemented from time to time, the "Credit Agreement").  Capitalized terms used herein shall have the respective meanings assigned to them in the Credit Agreement.

   1.  Pursuant to Section 2.1 of the Credit Agreement, Borrower hereby requests an Advance upon the following terms:

   (a)  The aggregate principal amount is to be $_____.

   (b)  The date of borrowing is to be _____.

   (c)  The Cash Needs to be met by such Advance are listed on the attached Schedule A.

   2.  Borrower hereby certifies to Lender that, on the date of this Notice of Borrowing and after giving effect to the requested Advance (including the use of the proceeds thereof):

   (a)  the representations and warranties of Borrower contained in the Loan Documents are correct in all material respects on and as of such date as though made on and as of such date or, as to those representations and warranties limited by their terms to a specified date, were correct in all material respects on and as of such date; and

   (b)  no Default is continuing or would result from the requested Advance being made; and

   (c)  no event or circumstance exists that can reasonably be expected to have a Material Adverse Effect.

The party signing below is an Authorized Representative and has caused this Notice of Borrowing to be duly executed on behalf of Borrower as of _____, 2010.

STATES INDUSTRIES, INC., debtor and debtor in possession

By: _____
___
            Authorized Representative
Printed Name:_____

EXHIBIT C
TO
DEBTOR IN POSSESSION CREDIT AGREEMENT

<u>Notice of Authorized Representatives</u>

Renwood States Lending, LLC
One Park Plaza
Suite 600
Irvine, CA  92614
Attn:  Mark Barbeau

Reference is made to that certain Debtor in Possession Credit Agreement States Industries, Inc., debtor and debtor in possession and Renwood States Lending, LLC, a Delaware corporation, dated as of August __, 2010, (as amended, modified or supplemented from time to time, the "Credit Agreement").  Capitalized terms used herein shall have the respective meanings assigned to them in the Credit Agreement.

Borrower hereby represents to Lender that the following persons are the Authorized Representatives, as defined in the Credit Agreement, and that the signatures opposite their names are their true signatures:

| <u>Name and Office</u> | <u>Signature</u> |
| --- | --- |
| _____ | _____ |
| _____ | _____ |
| _____ | _____ |

Lender is authorized to rely on this Notice of Authorized Representatives until such time, if any, as Borrower has delivered to Lender, and Lender has received, a duly executed Notice of Authorized Representatives in substitution hereof.  This Notice of Authorized Representatives cancels and supersedes any Notice of Authorized Representatives at any time prior to the date hereof delivered by Borrower to Lender.

IN WITNESS WHEREOF, Borrower hereby confirms that it has caused this Notice of Authorized Representatives to be duly executed as of _____, 2010.

STATES INDUSTRIES, INC., debtor and
debtor in possession


By:_____
Title:_____

**EXHIBIT D**
**TO**
**DEBTOR IN POSSESSION CREDIT AGREEMENT**

<u>**Form of Interim Financing Order**</u>

**EXHIBIT E**
**TO**
**DEBTOR IN POSSESSION CREDIT AGREEMENT**

**<u>Reporting Obligations</u>**

A.    <u>Daily reports required</u>:

1) Bank account activity
   a. Daily roll-forward of depository account
      i. Beginning balance (including amount of collected funds)
      ii. Collections
      iii. Transfer from depository account to disbursement account
      iv. Ending balance
   b. Daily roll-forward of disbursement account (book balance)
      i. Beginning balance
      ii. Transfers in from depository account and RSL
      iii. Checks/wires issued
      iv. Ending balance
2) Accounts receivable roll-forward
   a. Beginning balance
   b. Billing
   c. Collections
   d. Credit memos/adjustments
   e. Ending balance

B.    <u>Weekly reports required</u>:

3) DIP budget actual versus projected by line item both weekly and cumulative since petition date
4) Weekly versions of items (1) and (2) above
5) Inventory roll-forward
   a. Beginning balance
   b. Purchases
   c. COGS
   d. Adjustments
   e. Ending balance
6) Borrowing base certificate

C.    <u>Monthly reports required</u>:

7) Financial statements

**EXHIBIT B**

**BUDGET**

STATES INDUSTRIES INC.
Pet. No. 10-65148-fra11
8/24/10

# DEBTOR IN POSSESSION

10-Week Operating Cash Budget
Aug 24 - Oct 29, 2010

Ch 11 Post-Petition (24-Aug)

Week Ended

| | 24-Aug to 27-Aug | 3-Sep | 10-Sep | 17-Sep | 24-Sep | 1-Oct | 8-Oct | 15-Oct | 22-Oct | 29-Oct | (Ch 11) 10 Weeks Ended 10/29/10 |
|---|---|---|---|---|---|---|---|---|---|---|---|
| **OPERATING CASHFLOW (PROJECTED)** | | | | | | | | | | | |
| **TOTAL GROSS SALES** | 934,476 | 1,081,570 | 1,081,570 | 1,081,570 | 1,081,570 | 1,255,579 | 1,255,579 | 1,255,579 | 1,255,579 | 1,193,782 | 11,476,856 |
| **CASH RECEIPTS:** | | | | | | | | | | | |
| Gross Accounts Receivable Collections (3.0%) | 515,911 | 822,188 | 876,470 | 922,982 | 1,081,570 | 1,081,570 | 1,081,570 | 1,081,570 | 1,081,570 | 1,255,579 | 9,800,981 |
| Less: Projected Discounts Taken | (25,796) | (30,832) | (29,216) | (30,766) | (32,447) | (32,447) | (32,447) | (32,447) | (32,447) | (37,667) | (316,512) |
| Other Cash Receipts | - | 92,200 | - | - | - | - | - | - | - | - | 92,200 |
| **TOTAL CASH RECEIPTS** | 490,115 | 883,556 | 847,255 | 892,216 | 1,049,123 | 1,049,123 | 1,049,123 | 1,049,123 | 1,048,123 | 1,217,912 | 9,576,669 |
| **CASH DISBURSEMENTS:** | | | | | | | | | | | |
| **Purchases:** | | | | | | | | | | | |
| Total Raw Materials | 415,207 | 480,564 | 480,564 | 480,564 | 558,404 | 558,404 | 558,404 | 558,404 | 529,697 | 529,697 | 5,149,910 |
| Total Supplies | 62,613 | 72,469 | 72,469 | 72,469 | 83,923 | 83,923 | 83,923 | 83,923 | 80,477 | 80,477 | 776,668 |
| Total Transportation | 55,858 | 64,650 | 64,650 | 64,650 | 69,145 | 75,420 | 75,420 | 75,420 | 73,643 | 73,643 | 692,498 |
| **Total Purchases** | 533,678 | 617,683 | 617,683 | 617,683 | 711,473 | 717,748 | 717,748 | 717,748 | 683,817 | 683,817 | 6,619,076 |
| **Operating Expenses - Enid & Components:** | | | | | | | | | | | |
| Payroll - Bi/Weekly Hourly (incl 15% burden) | - | 235,812 | - | 235,812 | - | 235,812 | - | 235,812 | - | 235,812 | 1,179,061 |
| Payroll - Senior Management Salary (Sched A) | 24,863 | - | 24,863 | - | 24,863 | - | 24,863 | - | 24,863 | - | 124,317 |
| Payroll - SemiMonthly Salary (incl 15% burden) | 140,137 | - | 140,137 | - | 140,137 | - | 140,137 | - | 140,137 | - | 700,683 |
| Payroll Related - Other Taxes & Fees & Withholdings | 500 | 500 | 500 | 500 | 500 | 500 | 500 | 500 | 500 | 500 | 5,000 |
| Workers Comp Self-Insured | 6,000 | 7,500 | 7,500 | 7,500 | 7,500 | 7,500 | 7,500 | 7,500 | 7,500 | 7,500 | 73,500 |
| Workers Comp Settlement Payments | - | - | - | - | - | - | - | - | - | - | - |
| Benefit Plan Payments | 3,000 | 3,000 | 3,000 | 3,000 | 3,000 | 3,000 | 3,000 | 3,000 | 3,000 | 3,000 | 30,000 |
| Insurance | - | 10,000 | 11,700 | - | - | 10,000 | 11,700 | - | 10,000 | - | 53,400 |
| Tools & Supplies | 1,500 | 1,500 | 1,500 | 1,500 | 1,500 | 1,500 | 1,500 | 1,500 | 1,500 | 1,500 | 15,000 |
| Supplies | 200 | 250 | 250 | 250 | 250 | 250 | 250 | 250 | 250 | 250 | 2,400 |
| Project Hardwoods Supplies | 300 | 300 | 300 | 300 | 300 | 300 | 300 | 300 | 300 | 300 | 3,000 |
| PT to PT Tooling Expense | 200 | 200 | 200 | 200 | 200 | 200 | 200 | 200 | 200 | 200 | 2,000 |
| Quality Equipment & Training | 20 | 20 | 20 | 20 | 20 | 20 | 20 | 20 | 20 | 20 | 200 |
| PC Equip & Supplies | 20 | 20 | 20 | 20 | 20 | 20 | 20 | 20 | 20 | 20 | 200 |
| R & M Materials | 3,500 | 3,500 | 3,500 | 3,500 | 3,500 | 3,500 | 3,500 | 3,500 | 3,500 | 3,500 | 35,000 |
| R & M Outside Services | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 50,000 |
| R & M Tires | - | - | - | - | - | - | - | - | - | - | - |
| Rolls Maintenance | 1,200 | 1,200 | 1,200 | 1,200 | 1,200 | 1,200 | 1,200 | 1,200 | 1,200 | 1,200 | 12,000 |
| Office Supplies | - | 400 | 400 | 400 | 400 | 400 | 400 | 400 | - | - | 2,800 |
| Safety Supplies | 400 | 400 | 400 | 400 | 400 | 400 | 400 | 400 | 400 | 400 | 4,000 |
| Electricity & Water (Incl Ch 11 Dep - Week 1) | 90,000 | 15,000 | - | 70,000 | - | 15,000 | - | 70,000 | - | - | 260,000 |
| Natural Gas (Incl Ch 11 Dep - Week 1) | 27,000 | - | - | 27,000 | - | - | - | 27,000 | - | - | 81,000 |
| Diesel/Propane (Incl Ch 11 Dep - Week 1) | 28,000 | 14,000 | 14,000 | 14,000 | 14,000 | 14,000 | 14,000 | 14,000 | 14,000 | 14,000 | 154,000 |
| Telephone | - | - | - | 6,000 | - | - | - | 6,000 | - | 6,000 | 18,000 |
| Postage | - | 850 | 850 | 850 | 850 | 850 | 850 | 850 | - | - | 5,950 |
| Waste Disposal | - | - | - | - | 5,000 | - | - | - | - | 5,000 | 10,000 |
| Freight | 400 | 400 | 400 | 400 | 400 | 400 | 400 | 400 | 400 | 400 | 4,000 |
| Equipment Rental | - | 17,000 | - | - | - | - | 17,000 | - | - | - | 34,000 |
| Process Services (Incl Ch 11 Dep - Week 1) | 15,000 | 3,000 | 3,000 | 3,000 | 3,000 | 3,000 | 3,000 | 3,000 | 3,000 | 3,000 | 42,000 |
| LUC Fees (Incl Ch 11 Dep - Week 1) | 11,384 | 2,500 | 2,500 | 2,500 | 2,500 | 2,500 | 2,500 | 2,500 | 2,500 | 2,500 | 33,884 |
| Marketing / Customer Advertising Support | 15,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 41,500 |
| Sales | 20,000 | 25,000 | 25,000 | 25,000 | 25,000 | 25,000 | 25,000 | 25,000 | 25,000 | 20,000 | 240,000 |
| **Total Operating Expenses - Enid & Components** | 393,624 | 348,352 | 248,240 | 421,552 | 235,790 | 340,852 | 250,540 | 420,052 | 235,540 | 322,352 | 3,216,895 |

STATES\_INC'S CASH BUDGET-FINAL AUG24-7:35 PM
EXH B DIP CASH BGT SMRY AUG24

**APPENDIX A**
**Page 63 of 65**

EXHIBIT B
DIP Cash Budget
10 Weeks through 10/29/10

# DEBTOR IN POSSESSION
## 10-Week Operating Cash Budget
### Aug 24 - Oct 29, 2010

**Ch 11 Post-Petition (24-Aug)** — Week Ended

| | 24-Aug to 27-Aug | 3-Sep | 10-Sep | 17-Sep | 24-Sep | 1-Oct | 8-Oct | 15-Oct | 22-Oct | 29-Oct | (Ch 11) 10 Weeks Ended 10/29/10 |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Chapter 11 Administrative Expenses (Subject to Fee Applications, as appropriate) - Schedule A | 42,550 | 38,350 | 32,350 | 47,350 | 32,350 | 32,350 | 32,350 | 80,100 | 35,100 | 64,850 | 437,700 |
| LOC — 11.3% | - | - | - | - | - | 72,894 | - | - | - | 72,894 | 145,788 |
| Term Loans (3) — 14.3% | - | - | - | - | - | 90,117 | - | - | - | 90,117 | 180,234 |
| DIP Financing — 15.0% | - | - | - | - | - | 16,417 | - | - | - | 17,153 | 33,570 |
| **TOTAL CASH DISBURSEMENTS** | 969,852 | 1,004,385 | 898,273 | 1,086,585 | 979,613 | 1,270,378 | 1,000,638 | 1,217,900 | 954,457 | 1,251,184 | 10,633,264 |
| **NET CASH INFLOW/(OUTFLOW)** | (479,736) | (120,829) | (51,018) | (194,369) | 69,510 | (221,255) | 48,485 | (168,777) | 94,666 | (33,272) | (1,056,595) |

## DIP Financing / LOC Activity and Collateral Summary

| | 24-Aug to 27-Aug | 3-Sep | 10-Sep | 17-Sep | 24-Sep | 1-Oct | 8-Oct | 15-Oct | 22-Oct | 29-Oct | (Ch 11) 10 Weeks Ended 10/29/10 |
|---|---|---|---|---|---|---|---|---|---|---|---|
| **ACCOUNTS RECEIVABLE:** | | | | | | | | | | | |
| Projected Beginning AR Balance | 2,681,094 | 3,099,659 | 3,359,041 | 3,564,141 | 3,722,728 | 3,722,728 | 3,896,737 | 4,070,747 | 4,244,756 | 4,418,766 | 2,681,094 |
| Plus: Projected Gross Sales | 934,476 | 1,081,570 | 1,081,570 | 1,081,570 | 1,081,570 | 1,255,579 | 1,255,579 | 1,255,579 | 1,255,579 | 1,193,782 | 11,476,866 |
| Less: Discounts/Adjustments | (25,796) | (30,832) | (29,216) | (30,766) | (32,447) | (32,447) | (32,447) | (32,447) | (32,447) | (37,667) | (316,512) |
| Less: Projected AR Collections | (490,115) | (791,356) | (847,255) | (892,216) | (1,049,123) | (1,049,123) | (1,049,123) | (1,049,123) | (1,049,123) | (1,217,912) | (9,484,469) |
| Projected Ending AR Balance | 3,099,659 | 3,359,041 | 3,564,141 | 3,722,728 | 3,722,728 | 3,896,737 | 4,070,747 | 4,244,756 | 4,418,766 | 4,356,968 | 4,356,968 |
| Less: Ineligible | (156,876) | (156,875) | (156,875) | (156,875) | (156,875) | (156,875) | (156,875) | (156,875) | (156,875) | (156,875) | (156,876) |
| Eligible AR Collateral | 2,942,784 | 3,202,166 | 3,407,266 | 3,565,853 | 3,565,853 | 3,739,862 | 3,913,872 | 4,087,881 | 4,261,891 | 4,200,093 | 4,200,093 |
| Advance Rate — 85% | 2,501,367 | 2,721,841 | 2,896,176 | 3,030,975 | 3,030,975 | 3,178,883 | 3,326,791 | 3,474,699 | 3,622,607 | 3,570,079 | 3,570,079 |
| **INVENTORY:** | | | | | | | | | | | |
| Projected Beginning Inventory Balance | 7,283,117 | 7,392,052 | 7,392,052 | 7,392,052 | 7,392,052 | 7,392,052 | 7,501,600 | 7,501,600 | 7,501,600 | 7,501,600 | 7,283,117 |
| Plus: Projected Purchases | 477,821 | 553,033 | 553,033 | 553,033 | 553,033 | 642,328 | 642,328 | 642,328 | 610,174 | 610,174 | 5,926,578 |
| Plus: Projected Freight | 22,652 | 26,217 | 26,217 | 26,217 | 26,217 | 30,473 | 30,473 | 30,473 | 28,885 | 28,885 | 280,966 |
| Plus: Projected Labor & OH | 85,581 | 99,052 | 99,052 | 99,052 | 99,052 | 115,049 | 115,049 | 115,049 | 109,279 | 109,279 | 1,061,490 |
| Less: Projected Inventory Relieved | (477,118) | (678,302) | (678,302) | (678,302) | (678,302) | (787,850) | (787,850) | (787,850) | (748,337) | (748,337) | (7,090,064) |
| Projected Ending Inventory Balance | 7,392,052 | 7,392,052 | 7,392,052 | 7,392,052 | 7,392,052 | 7,501,600 | 7,501,600 | 7,501,600 | 7,462,087 | 7,462,087 | 7,462,087 |
| Less: Ineligible & Fallown Reserve | (422,571) | (422,571) | (422,571) | (422,571) | (422,571) | (422,571) | (422,571) | (422,571) | (422,571) | (422,571) | (422,571) |
| Eligible Inventory Collateral | 6,969,481 | 6,969,481 | 6,969,481 | 6,969,481 | 6,969,481 | 7,079,029 | 7,079,029 | 7,079,029 | 7,039,516 | 7,039,516 | 7,039,516 |
| Advance Rate — 62% | 4,321,078 | 4,321,078 | 4,321,078 | 4,321,078 | 4,321,078 | 4,388,998 | 4,388,998 | 4,388,998 | 4,364,500 | 4,364,500 | 4,364,500 |
| **AVAILABLE INVENTORY COLLATERAL** | | | | | | | | | | | |
| **TOTAL AVAILABILITY BEFORE RESERVES** | 6,822,445 | 7,042,919 | 7,217,254 | 7,352,053 | 7,352,053 | 7,567,881 | 7,715,789 | 7,863,697 | 7,987,107 | 7,934,579 | 7,934,579 |
| Less: Reserve - Term Loan | (230,000) | (230,000) | (230,000) | (230,000) | (230,000) | (230,000) | (230,000) | (230,000) | (230,000) | (230,000) | (230,000) |
| Less: Reserve - Credit Cards | (48,000) | (48,000) | (48,000) | (48,000) | (48,000) | (48,000) | (48,000) | (48,000) | (48,000) | (48,000) | (48,000) |
| Less: Reserve - Inventory | (150,000) | (150,000) | (150,000) | (150,000) | (150,000) | (150,000) | (150,000) | (150,000) | (150,000) | (150,000) | (150,000) |
| Less: Reserve - Letter of Credit | (450,000) | (450,000) | (450,000) | (450,000) | (450,000) | (450,000) | (450,000) | (450,000) | (450,000) | (450,000) | (450,000) |
| **TOTAL AVAILABILITY NET OF RESERVES** | 5,944,445 | 6,164,919 | 6,339,254 | 6,474,053 | 6,541,973 | 6,689,881 | 6,837,789 | 6,985,697 | 7,109,107 | 7,056,579 | 7,056,579 |

**APPENDIX A**
**Page 64 of 65**



Ch 11 - DIP Cash Budget
8/24/10

STATES INDUSTRIES INC.
Pet. No. 10-65148-fra11
8/24/10

EXHIBIT B
DIP Cash Budget
10 Weeks through 10/29/10

# DEBTOR IN POSSESSION
10-Week Operating Cash Budget
Aug 24 - Oct 29, 2010

Ch 11 Post-Petition (24-Aug)

Week Ended

| | 24-Aug to 27-Aug | 3-Sep | 10-Sep | 17-Sep | 24-Sep | 1-Oct | 8-Oct | 15-Oct | 22-Oct | 29-Oct | (Ch 11) 10 Weeks Ended 10/29/10 |
|---|---|---|---|---|---|---|---|---|---|---|---|
| **REVOLVER LOAN BALANCE:** | | | | | | | | | | | |
| Projected Beginning Revolver Balance | 7,775,370 | 8,330,107 | 8,543,136 | 8,594,154 | 8,788,523 | 8,719,013 | 8,990,268 | 8,941,783 | 9,110,560 | 9,015,894 | 7,775,370 |
| Less: Cash Collections | (490,115) | (791,356) | (847,255) | (892,216) | (1,049,123) | (1,049,123) | (1,049,123) | (1,049,123) | (1,049,123) | (1,217,912) | (9,484,469) |
| Plus: Advances Per Clearings | 969,852 | 1,004,385 | 898,273 | 1,086,585 | 979,613 | 1,270,378 | 1,000,638 | 1,217,900 | 954,457 | 1,251,184 | 10,633,264 |
| Plus: DIP Fees and Lender Legal Fees | 75,000 | - | - | - | - | 50,000 | - | - | - | - | 125,000 |
| Projected Ending Revolver Balance | 8,330,107 | 8,543,136 | 8,594,154 | 8,788,523 | 8,719,013 | 8,990,268 | 8,941,783 | 9,110,560 | 9,015,894 | 9,049,165 | 9,049,165 |
| | | | | | | | | | | | |
| **AVAILABILITY/(OVER ADVANCE)** | (2,385,662) | (2,378,217) | (2,254,900) | (2,314,470) | (2,177,040) | (2,300,387) | (2,103,994) | (2,124,863) | (1,906,787) | (1,992,586) | (1,992,586) |
| | | | | | | | | | | | |
| **TERM LOAN BALANCES (COMBINED A + B + C):** | | | | | | | | | | | |
| Projected Beginning Term Loan Balances | 7,676,911 | 7,676,911 | 7,584,711 | 7,584,711 | 7,584,711 | 7,584,711 | 7,584,711 | 7,584,711 | 7,584,711 | 7,584,711 | 7,676,911 |
| Less: Term Loan Principal Payments | | (92,200) | | | | | | | | | (92,200) |
| Projected Ending Term Loan Balances | 7,676,911 | 7,584,711 | 7,584,711 | 7,584,711 | 7,584,711 | 7,584,711 | 7,584,711 | 7,584,711 | 7,584,711 | 7,584,711 | 7,584,711 |
| | | | | | | | | | | | |
| **LETTER OF CREDIT (Incl in LOC Balance)** | | | | | | | | | | | - |
| | | | | | | | | | | | |
| **TOTAL REVOLVER + TERM LOANS + L/C** | 16,007,018 | 16,127,847 | 16,178,866 | 16,373,235 | 16,303,724 | 16,574,979 | 16,526,494 | 16,695,271 | 16,600,605 | 16,633,877 | 16,633,877 |
| | | | | | | | | | | | |
| **Ending Cash Balances** | | | | | | | | | | | |
| BofA - Depository (Control Acct) | 10,000 | 10,000 | 10,000 | 10,000 | 10,000 | 10,000 | 10,000 | 10,000 | 10,000 | 10,000 | 10,000 |
| BofA - States Disbursement Acct | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 |
| Key Bank - Payroll / PR Tax Acct | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 |
| Carve-out Account (Fee Payment per Procedure) | 42,550 | 38,350 | 32,350 | 47,350 | 32,350 | 32,350 | 32,350 | 42,350 | | | 300,000 |
| **Total Ending Cash Balance (Projected)** | 20,000 | 20,000 | 20,000 | 20,000 | 20,000 | 20,000 | 20,000 | 20,000 | 20,000 | 20,000 | 20,000 |