**Brad T. Summers, OSB No. 911116**
tsummers@balljanik.com
**Justin D. Leonard, OSB No. 033736**
jleonard@balljanik.com
BALL JANIK LLP
101 SW Main Street, Suite 1100
Portland, OR 97204
Telephone: (503) 228-2525
Facsimile: (503) 295-1058

      Attorneys for States Industries, Inc.


## IN THE UNITED STATES BANKRUPTCY COURT

## FOR THE DISTRICT OF OREGON

| | |
|---|---|
| In re<br><br>**STATES INDUSTRIES, INC.,**<br><br>    Debtor-in-Possession. | Case No. 10-65148-fra11<br><br>**DECLARATION OF JOHN L. DAVIDSON IN SUPPORT OF DEBTOR'S MOTIONS FOR FIRST DAY RELIEF** |

I, John L. Davidson, hereby declare as follows:

1.      I am the Chief Restructuring Officer of States Industries, Inc., a corporation organized under the laws of the State of Oregon ("States," the "Company," or the "Debtor"). I submit this declaration in support of the requests for relief contained in States' "first day" motions, which have been filed contemporaneously herewith.

2.      States requests that its "first day" motions be set for hearing not later than August 27, 2010, and preferably on August 26. The reason for this request is that States needs to fund amounts to States' payroll processor on August 27, so that a payroll can be paid the following Monday, August 30, 2010, when the payroll is regularly due. States needs to obtain approval of a debtor-in-possession financing facility so that it can fund that payroll and pay other operating expenses arising in the ordinary course of States' business. States also needs to obtain

Page 1 -   **DECLARATION OF JOHN L. DAVIDSON IN SUPPORT OF DEBTOR'S MOTIONS FOR FIRST DAY RELIEF**

BALL JANIK LLP
One Main Place
101 Southwest Main Street, Suite 1100
Portland, Oregon 97204-3219

approval so that it can pay the pre-petition amounts that are included in the August 30 payroll. States would suffer immediate and irreparable harm to its estate if the debtor-in-possession financing is not put in place in time to fund this regular payroll when it is due, and to fund other expenses incurred in the ordinary course of States' business between now and the time of a final hearing on the financing.

## I.  INTRODUCTION

3.      On the date hereof (the "Petition Date"), States commenced its chapter 11 case by filing a voluntary petition for relief under title 11 of the United States Code (the "Bankruptcy Code").

4.      To minimize the adverse effects on its business as a result of the commencement of the case, States requests various types of relief in certain "first day" motions, which have been filed with the Court.  States has filed the following "first day" motions:

   a.      Motion for Interim and Final Orders (A) Authorizing Debtor to Incur Post-Petition Secured Indebtedness; (B) Granting Security Interests and Priority Pursuant to 11 U.S.C. § 364; and (C) Setting Final Hearing;

   b.      Motion for Order Authorizing Debtor to Pay Pre-Petition Employee Obligations and Pre-Petition Withholding Obligations and Directing Banks to Honor Related Pre-Petition Transfers;

   c.      Motion for Continuation of Utility Services; and

   d.      Debtor's Motion for Order Authorizing (A) Maintenance of Bank Accounts and Continued Use of Existing Business Forms and Checks, (B) Continued Use of Existing Cash Management System, and (C) Waiving Certain Investment and Deposit Guidelines.

5.      In its "first day" motions, States seeks, among other things, to:  (a) continue the Debtor's business operations while in chapter 11 with as little disruption as possible; (b) maintain the confidence and support of key constituencies and employees; and (c) obtain interim approval

Page 2 -   **DECLARATION OF JOHN L. DAVIDSON IN SUPPORT OF DEBTOR'S MOTIONS FOR FIRST DAY RELIEF**

::ODMA\PCDOCS\PORTLAND\722006\3-OD

for debtor-in-possession financing from its current lender, Renwood States Lending, LLC. Gaining and maintaining the support of States' key constituencies, including our employees, customers, and vendors, as well as maintaining the day-to-day operations of States' business with minimal disruption to maintain operational continuity, is crucial to the success of our reorganization efforts.

6.      In addition to the personal knowledge that I have acquired as Chief Restructuring Officer of States, I also have knowledge of, and familiarity with, States' books and records, and financial and operational affairs. I have also worked closely with States' personnel who handle business operations and financial management, as well as with States' outside counsel and other advisors. Except as otherwise indicated, all statements in this declaration are based upon my personal knowledge, my review of States' books and records, other relevant documents, and other information prepared or collected by States' employees, or my experience with States' operations and financial condition.

7.      If I were called to testify as a witness in this matter, I could and would competently testify to each of the facts set forth herein based upon my personal knowledge and review of documents.

## I.  BACKGROUND

8.      The Debtor manufactures and sells natural wood veneered panels to consumers in the form of residential wall paneling. The Debtor also manufactures and sells industrial panels to manufacturers of cabinets, furniture, store fixtures, and architectural interiors. The Debtor's consumer products are sold through retail home improvement stores. The Debtor's industrial panels are supplied through a network of independent wholesale distributors throughout North America. The Debtor controls lamination, finishing, and component machinery and can therefore engineer products at each stage to deliver high quality and reasonable cost.

Page 3 -    **DECLARATION OF JOHN L. DAVIDSON IN SUPPORT OF DEBTOR'S MOTIONS FOR FIRST DAY RELIEF**

BALL JANIK LLP
One Main Place
101 Southwest Main Street, Suite 1100
Portland, Oregon 97204-3219

9.      The Debtor is a 44-year-old, privately held company, headquartered in Eugene, Oregon.  Prior to business setbacks during the current recession, the Debtor had over 400 employees.  Currently the Debtor has approximately 230 employees.

10.     Until recently, the Debtor operated plants in Eugene, Oregon and in Mocksville, North Carolina.  The North Carolina operation was shut down in March of 2009, as management took steps to improve profitability and focus its efforts on the Company's substantially larger and more established West Coast operations.  The Eugene plant remains in operation at this time.  The Eugene plant is approximately 252,000 square feet spread across ten buildings on 53 acres.  The Eugene plant consists of two different facilities.  The primary facility is owned by the Debtor and is located at 29545 East Enid Road, Eugene, Oregon.  The Debtor's secondary facility is owned by SI Properties, Inc. and is located at 95 Foch Street, Eugene, Oregon.  SIP is a wholly-owned subsidiary of the Debtor.  The Debtor is not currently conducting operations at the Foch Street Property.

11.     The Debtor's revenues for its fiscal year ended March 31, 2008 were approximately $128 million.  Revenues declined to approximately $94 million for fiscal year 2009 and $61 million for fiscal year 2010.  Revenues for fiscal year 2011 through July are approximately $20 million.

12.     The Debtor's lender, Renwood States Lending, LLC (the "Lender" or "Renwood"), has a blanket security interest in the Debtor's assets.  Renwood is owed approximately $15.5 million.

13.     The Debtor commenced this case to prevent any interruption in and to protect its business while pursuing a sale of its assets.  The Debtor anticipates seeking Court approval for a sale process in the next few weeks.

Page 4 -   **DECLARATION OF JOHN L. DAVIDSON IN SUPPORT OF DEBTOR'S MOTIONS FOR FIRST DAY RELIEF**

::ODMA\PCDOCS\PORTLAND\722006\3-OD

## II.  FIRST DAY MOTIONS

14.     Concurrently with the filing of this case, States is filing a number of "first day" motions.[1]  These motions have been designed to meet the immediate goals of continuing States' operations during the case with as little disruption and loss of productivity as possible, and maintaining the confidence and support of vendors, customers, employees and other key constituencies.  I have reviewed each of the "first day" motions, including the exhibits thereto, and I believe that the relief sought in each of the motions is narrowly tailored to meet the goals described above and, ultimately, will be critical to States' ability to achieve success in this chapter 11 case.

**A.     Motion for Interim and Final Orders (A) Authorizing Debtor to Incur Post-Petition Secured Indebtedness; (B) Granting Security Interests and Priority Pursuant to 11 U.S.C. § 364; and (C) Setting Final Hearing**

15.     As of the Petition Date, the Debtor and certain non-Debtor affiliates were parties to that certain Loan and Security Agreement dated as of May 3, 1999 (as amended, the "Pre-Petition Credit Agreement," and together with the other documentation executed in connection therewith, the "Pre-Petition Credit Agreements") with LaSalle Business Credit, Inc. ("LaSalle").

16.     Under the Pre-Petition Credit Agreements, LaSalle provided the Debtor with revolving and term loan credit facilities and other financial accommodations.  Under the Pre-Petition Credit Agreements, the Debtor and certain of the other non-Debtor subsidiaries granted a security interest to LaSalle in their present and future real or personal property, including equipment, inventory, general intangibles, and accounts receivable (the "Pre-Petition Collateral").

---

[1]    Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the relevant motion.

Page 5 -    **DECLARATION OF JOHN L. DAVIDSON IN SUPPORT OF DEBTOR'S MOTIONS FOR FIRST DAY RELIEF**

BALL JANIK LLP
One Main Place
101 Southwest Main Street, Suite 1100
Portland, Oregon  97204-3219

17.     Renwood (the "Lender") is the successor-in-interest to the rights of LaSalle under the Pre-Petition Credit Agreements.

18.     The aggregate obligations owing to the Lender as of the Petition Date were approximately $15.5 million in principal amount, plus interest thereon and fees and expenses incurred in connection therewith as provided in the Pre-Petition Credit Agreements (collectively, the "Pre-Petition Debt").

19.     The Debtor believes that the Lender has first priority liens on assets that comprise substantially all of the value of the Debtor's business, subject to permitted liens under the Pre-Petition Credit Agreements.  Substantially all of the Debtor's existing cash and anticipated future cash receipts are generated from the Pre-Petition Collateral and thus constitute cash collateral of the Lender within the meaning of section 363(a) of the Bankruptcy Code (the "Cash Collateral").

20.     Prior to the commencement of this case, the Debtor solicited proposals for debtor-in-possession financing from other third-party financial institutions, without any success. The proposed Debtor-in-Possession Facility from the Lender (the "DIP Facility") was the only committed proposal for financing received from any party.  Based on my experience, in light of the leverage on the Debtor's balance sheet, the Debtor would not be able to obtain financing by merely offering a new lender an administrative expense claim or a junior lien.  Consequently, the Debtor focused its efforts on the Lender, engaging in discussions with the Lender to try to obtain the best possible terms for the debtor-in-possession financing.  Those discussions resulted in the DIP Facility, a true and correct copy of which is attached as **Exhibit A** to the Motion for Interim and Final Orders (A) Authorizing Debtor to Incur Post-Petition Secured Indebtedness; (B) Granting Security Interests and Priority Pursuant to 11 U.S.C. § 364; and (C) Setting Final Hearing (the "DIP Financing Motion").

21.     The DIP Facility is the result of arms-length negotiations between the Lender and the Debtor.

Page 6 -   **DECLARATION OF JOHN L. DAVIDSON IN SUPPORT OF DEBTOR'S MOTIONS FOR FIRST DAY RELIEF**

::ODMA\PCDOCS\PORTLAND\722006\3-OD

22.     Allowing the Debtor to obtain the DIP Facility will minimize disruption of the Debtor's business as a going concern, will increase the possibility for a successful reorganization, and is in the best interests of the Debtor's bankruptcy estate.

23.     With the credit provided by the Lender, the Debtor will be able to obtain goods and services in connection with its operations, thereby permitting the Debtor to create revenues to pay its employees and operate its business for the benefit of all parties-in-interest until the time the Debtor consummates a sale of its assets.

24.     In addition, the availability of credit under the DIP Facility should give the Debtor's suppliers and vendors the necessary confidence to continue ongoing relationships with the Debtor, including the extension of credit terms for the payment of goods and services, and be viewed favorably by the Debtor's employees and customers, thereby helping to promote the Debtor's successful restructuring.

25.     With the assistance of States personnel, I prepared the budget attached to the DIP Financing Motion as **Exhibit B** (the "Budget").  The Budget has been thoroughly reviewed by the Debtor and its management.  The Debtor and its management believe that the Budget is achievable and will allow the Debtor to operate its business and otherwise conduct its bankruptcy case.  Without the DIP Facility, States has insufficient funds to meet its expenses and other payments set forth in the Budget.

26.     States has an immediate need to use funds advanced under the DIP Facility to pay its vendors, wages, salaries and operating expenses.

27.     States has been unable to obtain post-petition financing sufficient to meet its operating needs through unsecured credit allowable as an administrative expense.

28.     States will suffer immediate and irreparable harm if it is not permitted to obtain the DIP Facility to meet its necessary and ordinary course post-petition operating expenses prior to the time prescribed by Bankruptcy Rule 4001 for a final hearing on the DIP Financing Motion.

Page 7 -    **DECLARATION OF JOHN L. DAVIDSON IN SUPPORT OF DEBTOR'S MOTIONS FOR FIRST DAY RELIEF**

::ODMA\PCDOCS\PORTLAND\722006\3-OD

BALL JANIK LLP
One Main Place
101 Southwest Main Street, Suite 1100
Portland, Oregon 97204-3219

**B.     Motion for Order Authorizing Debtor to Pay Pre-Petition Employee Obligations and Pre-Petition Withholding Obligations and Directing Banks to Honor Related Pre-Petition Transfers**

29.     In the ordinary course of its business, States currently employs approximately 230 employees (the "Employees").  The workforce includes hourly and salaried Employees who work either full-time, part-time or on a temporary basis.  The continued and uninterrupted service of these Employees is vital to the States' continuing operations and reorganization efforts.

30.     As of the Petition Date, current Employees were owed or had accrued various sums for wages, salaries, vacation/sick pay and other accrued compensation.  In addition, as of the Petition Date, States had made deductions from Employees' paychecks to make payments on behalf of Employees for charitable and political contributions, garnishments, support payments and tax levies, savings programs, benefit plans, insurance programs, and other similar programs on account of which States deducts a sum of money from an Employee's paycheck and pays that amount to a third party.  Also, in the ordinary course of business, and as of the Petition Date, States had made withholdings from employees' paychecks on account of various federal, state and local income, FICA, and other taxes.

31.     Furthermore, the Debtor routinely reimburses Employees for certain restricted expenses incurred within the scope of their employment, including expenses for travel, lodging, ground transportation, meals, supplies, and miscellaneous business expenses.  Employee morale will erode if Debtor is unable to reimburse its Employees for pre-petition business expenses that Employees personally incurred on behalf of the Debtor in the ordinary course of business.

32.     In addition, in the ordinary course of its business, States maintains certain employee benefit programs.  Obligations of States under any employee benefit programs would have accrued in whole or in part prior to the Petition Date, but will not become payable in the ordinary course of business until a later date.

Page 8 -    **DECLARATION OF JOHN L. DAVIDSON IN SUPPORT OF DEBTOR'S MOTIONS FOR FIRST DAY RELIEF**

::ODMA\PCDOCS\PORTLAND\722006\3-OD

33.    States' last payment cycle occurred on August 20, 2010 for hourly Employees (for work through August 15, 2010), and on August 13, 2010 for salaried Employees (for work through August 15, 2010).  Thus, the above-described pre-petition compensation, deductions, withholding, business expense reimbursements, and employee benefit contributions (together "Compensation Obligations") were due and owing as of the Petition Date to the Employees or the applicable employee benefit plan because, among other things:

a.    States filed its chapter 11 petition in the middle of its regular and customary wage payroll periods, as well as in the middle of its regular reimbursement cycle for Employee business expenses;

b.    Many payroll and expense reimbursement checks issued to Employees prior to or on the Petition Date have not yet been presented for payment or have not yet cleared the banking system and accordingly were not honored and paid as of the Petition Date;

c.    Employees have not yet been paid certain of their salaries, contractual compensation and wages for services previously rendered to States or have not yet been reimbursed for business expenses previously advanced on behalf of States; and certain other forms of compensation (including vacation/sick pay, holiday pay, and withholdings for benefit plan contributions) related to pre-petition services have not yet been paid to or for the benefit of Employees because such benefits, although accrued either in whole or in part prior to the Petition Date, were not payable at such time, but rather will become payable in the immediate future in the ordinary course of States' business.

34.    It is necessary for States to pay the Compensation Obligations for numerous reasons, including, among other reasons noted below, the critical need to retain the Employees and to maintain company morale.

Page 9 -    **DECLARATION OF JOHN L. DAVIDSON IN SUPPORT OF DEBTOR'S MOTIONS FOR FIRST DAY RELIEF**

::ODMA\PCDOCS\PORTLAND\722006\3-OD

35.     The Debtor's Employees are the lifeblood of its business.  It is imperative that States be authorized to pay all Compensation Obligations owed to the Employees.  Any delay in making such payments will seriously harm States' relationships with its Employees and impair its ability to retain qualified and motivated personnel.  States faces the significant risk that its operations may be severely impaired if States is not immediately granted authority to pay the Compensation Obligations.

36.     Bolstering Employee morale and thereby maintaining a "business as usual" atmosphere will facilitate States' ongoing efforts to maximize the value of its estate.  To maintain quality control and to enable many key employees to perform their jobs effectively, States must continue its corporate policies of permitting the Employees to incur business-related expenses and thereafter seek reimbursement by submitting appropriate invoices or vouchers evidencing such out-of-pocket disbursements.  Without the requested relief, States' stability would be undermined by the potential threat that otherwise loyal Employees at all levels would seek other employment.

37.     States estimates that, as of the Petition Date, the total amount that had accrued but remained unpaid on account of Compensation Obligations was approximately $242,000.

38.     States' books and records indicate that in no instance will the combined amount of unpaid pre-petition wages, salaries and contractual compensation owing to an employee, plus amounts sought for employee benefit contributions, exceed the sum of $11,725.

39.     In the normal course of business, States maintains accurate and complete records of the amounts it pays in respect of each category of the Compensation Obligations.  States intends to continue to maintain such records on an ongoing basis.

40.     With the proposed debtor-in-possession financing described above, States has anticipated access to cash sufficient to pay all Compensation Obligations as such amounts become due.

Page 10 - **DECLARATION OF JOHN L. DAVIDSON IN SUPPORT OF DEBTOR'S MOTIONS FOR FIRST DAY RELIEF**

BALL JANIK LLP
One Main Place
101 Southwest Main Street, Suite 1100
Portland, Oregon  97204-3219

**C.**      **Motion for Continuation of Utility Services**

41.      In connection with the operation of its business, States obtains electricity, gas, water, telephone services, internet service, trash collection, and/or other similar services from a number of utility companies.

42.      Uninterrupted utility services are essential to the preservation of States' estate and assets, and therefore, to the success of this case.

43.      States' business depends on the functioning of its corporate offices and its manufacturing facilities, which require a constant supply of utility services to carry out its business.  Should any utility company refuse or discontinue service, even for a brief period, the Debtor's facilities would immediately be forced to cease operations.  Consequently, without uninterrupted utility services the Debtor's ability to preserve and maximize the value of its estate could be severely and irreparably harmed.  It is therefore critical that utility services continue uninterrupted.

44.      Exhibit A to the Debtor's Motion for Continuation of Utility Services lists States' current utility companies (the "Utility Companies") and the approximate amount of one month's charges for each company, which States proposes to pay as a deposit.  States has made an extensive and good faith effort to identify all of its utility companies.  States has a long and established payment history with most if not all of its Utility Companies.  A one-month deposit for those Utility Companies that request it should provide more than adequate assurance of payment.  States has a powerful incentive to stay current on its utility obligations because of its significant reliance on Utility Services to maintain its business operations.

45.      The proposed debtor-in-possession financing described above will provide sufficient funds to pay operating costs, including the cost of services from the Utility Companies and the one-month deposits.

Page 11 -  **DECLARATION OF JOHN L. DAVIDSON IN SUPPORT OF DEBTOR'S MOTIONS FOR FIRST DAY RELIEF**

BALL JANIK LLP
One Main Place
101 Southwest Main Street, Suite 1100
Portland, Oregon 97204-3219

**D.    Motion for Order Authorizing Maintenance of Bank Accounts and Continued Use of Existing Business Forms and Checks, Continued Use of Existing Cash Management Systems, and Waiving Certain Investment and Deposit Guidelines**

46.    The structure of States' cash management system is, in large part, a function of its agreements with its lender, Renwood.  States is required to maintain a certain lockbox address and deposit account for handling all electronic and check payments to States (Bank of America Acct. no. xxxxxx2073) (the "Deposit Account").   The Deposit Account is presently subject to a Deposit Account Control Agreement among States, Renwood, and Bank of America.

47.    States receives checks and electronic fund transfers (including Automated Clearing House ("ACH") transactions and wire transfers) on a daily basis from customers through the Deposit Account.  Through the Deposit Account Control Agreement, Renwood has a security interest in the Deposit Account, including all checks mailed to the Deposit Account's lockbox address and all ACH transfers to the Deposit Account.

48.    For disbursements, States uses a Bank of America distribution account (no. xxxxxx7487) that is linked to the Deposit Account.  Employee wage payments (which are managed by ADP, a third-party servicer) are funded through the Debtor's separate Key Bank corporate payroll accounts for hourly (acct. no. xxxxxxxx1209) and salaried (acct. no. xxxxxxxx1217) employee payments.   The Debtor also has a separate account at Bank of America (acct. no. xxxxxxx7438) for its self-funded workers compensation program.  The Debtor's accounts (together, the "Bank Accounts") are listed below:

::ODMA\PCDOCS\PORTLAND\722006\3-OD

BALL JANIK LLP
One Main Place
101 Southwest Main Street, Suite 1100
Portland, Oregon  97204-3219

| **Account Type** | **Bank Name & Account No.** |
|---|---|
| Lockbox Deposit Account | Bank of America - # xxxxxx2073 |
| Distribution Account | Bank of America - # xxxxxx7487 |
| Hourly Payroll Account | Key Bank - # xxxxxx1209 |
| Salary Payroll Account | Key Bank - # xxxxxx1217 |
| Workers Comp Account | Bank of America - # xxxxxx7438 |

49.     The Debtor is seeking authority to maintain and continue to use its existing bank accounts in the name and with the account numbers existing immediately prior to the Petition Date.  Each account is set up in the Debtor's accounting system to receive daily electronic bank transaction files, which facilitates the monthly reconciliation process.  The Debtor's transition into chapter 11 will be significantly less disruptive if its existing bank accounts are maintained following the commencement of this case with the same account numbers and, where applicable, automated relationship.  The Debtor does not believe that allowing it to do so will prejudice any party-in-interest or the estate.  If the relief requested is granted, the Debtor will not pay, and each of the banks where the bank accounts are maintained will be instructed not to pay, any debts incurred before the Petition Date other than as specifically authorized by this Court.

50.     The Debtor's bank accounts are held by authorized depositories in the District of Oregon (Bank of America and Key Bank) and are subject to significant oversight by the Debtor and its Lender.

51.     Particularly in the first weeks of this case, preserving a "business as usual" atmosphere and avoiding the unnecessary distractions that would inevitably be associated with a substantial disruption of the cash management system, will facilitate and enhance the Debtor's efforts to maximize the value of its assets for the benefit of interested parties.

Page 13 - **DECLARATION OF JOHN L. DAVIDSON IN SUPPORT OF DEBTOR'S MOTIONS FOR FIRST DAY RELIEF**

::ODMA\PCDOCS\PORTLAND\722006\3-OD

BALL JANIK LLP
One Main Place
101 Southwest Main Street, Suite 1100
Portland, Oregon 97204-3219

52.     If the Debtor was forced to close its accounts, there would be disruption and confusion that would negatively impact operations.  For instance, funds may be deposited into the wrong account, misapplied, held in limbo, or otherwise delayed, thus adversely affecting the Debtor's relationships with vendors and customers, which already may be burdened by the filing of the chapter 11 case.

53.     The Debtor's cash management system constitutes a customary and essential business practice and was created and implemented by the Debtor's management in the exercise of their business judgment.  The cash management system is similar to those commonly employed by corporate enterprises comparable to the Debtor in size and complexity.

54.     To minimize administrative expense and delay, the Debtor is also seeking authority to continue to use its pre-printed checks, correspondence, and business forms, including, but not limited to, letterhead, envelopes, promotional materials, and other business forms, substantially in the forms existing immediately prior to the Petition Date.  As of the Petition Date, the Debtor had a large stock of pre-printed checks, as well as other business forms that it uses in the ordinary course of business.  Reprinting check stock (and any other business forms) to indicate that the Debtor is a "Debtor-in-Possession" would impose an unnecessary burden and expense on the Debtor.

**E.     Motion for Order Establishing Procedures for Provisional Payment of Compensation and Expenses of Professionals and Committee Members on a Monthly Basis**

55.     This case is among the larger chapter 11 cases pending in this district.  The level of professional activity in this case will be quite high if the Debtor is to accomplish a sale of its assets in a quick and efficient manner.  Given the large amount of services required, the accrued amounts owing to an individual professional could easily become substantial.  Forcing the professionals to wait a protracted period of time for payment would work a substantial hardship on any professional.  Furthermore, to the extent any professional is paid in excess of the amount

Page 14 - **DECLARATION OF JOHN L. DAVIDSON IN SUPPORT OF DEBTOR'S MOTIONS FOR FIRST DAY RELIEF**

BALL JANIK LLP
One Main Place
101 Southwest Main Street, Suite 1100
Portland, Oregon 97204-3219

ultimately allowed by the Court, there is no reason to believe that such amount would not be repaid promptly. Many of the same factors apply equally to creditor committee members.

56.     There are other good reasons for establishing a monthly compensation procedure. First, monthly payment of professional fees will subject professional services to the same sort of scrutiny that other goods and services used by a debtor in possession must receive. It will encourage all parties in this chapter 11 case to make efficient use of professional services, and to avoid such services when their cost would exceed the likely benefit. Moreover, the regular payment of professional fees and creditor committee member reimbursements, if any, would minimize the need for creating reserves for such obligations, and would ensure that the accumulation of unpaid fees was not an obstacle to consummation of a plan of reorganization.

57.     Equally important, the proposed compensation procedures will save time for the bankruptcy estate and the Court. The procedures contemplate that all applications for a particular period of time are considered together. Without such procedures, fee applications can be filed by any professional at any time. That approach would create additional work for the Court and the parties in reviewing and deciding fee applications throughout the case, instead of at regular intervals.

### III.  CONCLUSION

58.     The primary purpose of the filing of this chapter 11 case is to prevent deterioration and to protect the going-concern value of the Debtor's business while the Company effectuates a chapter 11 sale. In the interim, through the motions described above, States seeks to minimize certain adverse affects that this case might otherwise have on its business, while honoring the spirit of the chapter 11 process.

59.     To preserve the value of its business to the fullest extent possible, States' immediate objective is to maintain "business as usual" following the commencement of this case by minimizing the adverse impact of the filing on the Debtor's assets and operations. For the reasons described herein and in the "first day" motions, I believe that the prospect for achieving

Page 15 - **DECLARATION OF JOHN L. DAVIDSON IN SUPPORT OF DEBTOR'S MOTIONS FOR FIRST DAY RELIEF**

BALL JANIK LLP
One Main Place
101 Southwest Main Street, Suite 1100
Portland, Oregon 97204-3219

these objectives for the benefit of creditors and other stakeholders will be substantially enhanced if this Court grants the relief requested in each of the "first day" motions and respectfully request the Court to do so.

I declare under penalty of perjury under the laws of the State of Oregon that the foregoing is true and correct and that this Declaration was executed on August 24, 2010 in Eugene, Oregon.


 /s/ John L. Davidson
John L. Davidson

Page 16 - **DECLARATION OF JOHN L. DAVIDSON IN SUPPORT OF DEBTOR'S MOTIONS FOR FIRST DAY RELIEF**

BALL JANIK LLP
One Main Place
101 Southwest Main Street, Suite 1100
Portland, Oregon  97204-3219